278 F.3d 103
 Pamela J. PHILLIPS, Plaintiff-Appellee,
v.
James BOWEN, individually and in his capacity as Sheriff of the County of Saratoga, M.T. Woodcock, individually and in his capacity as Chief Deputy Sheriff of the County of Saratoga, William S. Baker, individually and in his capacity as personnel director of the County of Saratoga, and the County of Saratoga, Defendants-Appellants.
 Docket No. 00-7525.
 United States Court of Appeals, Second Circuit.
 Argued May 4, 2001.
 Decided January 24, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED John W. Bailey, Ainsworth, Sullivan, Tracy, Knauf, Warner and Ruslander, P.C. (Rebecca A. Slezak, on the brief), Albany, NY, for Appellants.
 John D. Charles, Clifton Park, NY, for Appellee.
 Before: McLAUGHLIN and POOLER, Circuit Judges, and MARTIN, District Judge.*
 POOLER, Circuit Judge.
 
 
 1
 Defendants James Bowen and M.T. Woodcock appeal from the March 31, 2000, judgment of the United States District Court for the Northern District of New York (Lawrence E. Kahn, Judge) in favor of plaintiff Pamela J. Phillips. A trial jury found that defendants, who were plaintiff's work supervisors, retaliated against Phillips after she exercised her First Amendment rights, but the same jury rejected Phillips' claims of sexual harassment. On her retaliation claim, Phillips had to show, among other things, that she suffered an adverse employment action at the hands of defendants. While we acknowledge that the trial proof on this issue was close, we hold that the evidence before the jury was sufficient. We thus do not disturb the jury's factual findings regarding liability. We also hold that the jury's award of $400,000 in damages was not excessive.
 
 BACKGROUND
 
 2
 Beginning in 1978, Phillips worked in the Saratoga County Sheriff's Department, where she held different jobs, including that of civil deputy. Bowen was Saratoga County sheriff, which is an elected position, and Woodcock was chief deputy sheriff. In a lawsuit filed on April 2, 1996, Phillips claimed that defendants violated 42 U.S.C. §§ 1983 and 1988 when they harassed her at work because she supported the 1993 election campaign of Christopher Morrell, who contested for Bowen's job and lost. Phillips also alleged in her complaint that defendants discriminated against her on the basis of her gender in violation of Title VII.
 
 
 3
 In a memorandum-decision and order dated February 9, 1998, the district court granted partial summary judgment to defendants regarding plaintiff's claims that they denied her promotional opportunities and certain economic benefits in retaliation for her political support of Morrell. A jury heard Phillips' remaining allegations during a two-week trial in February 1998. The jury ruled in favor of defendants on the sex discrimination claims, which are not part of this appeal. We therefore discuss here the evidence that the jury heard in support of Phillips' claims of retaliation.
 
 
 4
 In early 1993, Phillips decided to support the campaign of Morrell for sheriff. She informed Bowen of her decision, and shortly thereafter Bowen stated during an office meeting that "for those of you gathering [nominating] petitions, there is only one politician in this department, and that's me." Phillips took this comment as a direction from Bowen for her to stop her political activity in favor of Morrell, and when she asked Bowen about it, he responded by asking if she had a "guilty conscience." During the campaign, a news story appeared indicating that the department failed to issue a bullet-proof vest to Phillips, contrary to Bowen's claim that all of his deputies had the equipment. In mid-October, Bowen and Woodcock made efforts to order Phillips a bullet-proof vest, which arrived in March 1994. By this time, Morrell had lost the election, and Bowen retained his office. The vest that Phillips received lacked a "carrier" allowing it to be worn outside of her shirt, so defendants ordered her to wear it under her shirt even though it did not fit comfortably under the uniform. According to Phillips, for two weeks — until she could order and receive larger uniform shirts — defendants forced her to wear the vest under her shirt irrespective of the fact that she couldn't fasten the center button of her shirt and had to appear in public in that way. At one time, defendants cited Phillips for not wearing her vest under her shirt. Plaintiff did not receive a carrier for her vest until two years later.
 
 
 5
 In September 1993, Phillips' supervisors directed her to make an unusual warrant arrest in which Phillips was to transfer a prisoner to Albany County for processing. Phillips made the arrest. But when Phillips called her office twice for help in making necessary calls to Albany officials, Bowen indirectly and then directly refused to assist her and told Phillips "to do [her] goddamn job and stop calling and... bothering the women [in his office]." Phillips ultimately had to release the prisoner.
 
 
 6
 Also after the election, in December 1994, Phillips testified that she responded to a dispatcher's call and a citizen who flagged her down to help subdue a man who was having an adverse reaction to medication. While she was at the scene, however, Woodcock ordered her to leave, which she did. Afterwards, a sergeant told her for the first time that she was not supposed to "handle calls." Phillips asked Bowen to explain what this new directive meant, and he first told her not to handle calls and then told her to "use [her] head" in deciding whether to respond to a call.
 
 
 7
 In addition to these specific instances, Phillips testified that she endured additional retaliation. For example, she stated that other members of the department with whom she had been friendly before the 1993 election "shunned" her because they were afraid of Bowen's potential retaliation. As a result of this conduct, Phillips was cut off from social interaction with her peers. On another occasion in December 1994, defendants initially denied her overtime pay because she had not obtained prior approval, which they had not required previously. A short time later, in January 1995, Woodcock yelled at Phillips, calling her "insubordinate" and "stupid," because she punched her time card at 2:02 instead of 2 p.m. During this incident, which took place in front of Phillips' co-workers, "he proceeded to demonstrate the workings of a clock, where the little hand had to be and the big hand had to be." In January 1996, Woodcock and a lieutenant conducted a "counseling session" with Phillips during which they admonished her for, among other things, not using a radio to sign in and out of service even though she had told the lieutenant that the radio in the car to which defendants assigned her was broken and irreparable.
 
 
 8
 Phillips' co-workers testified that they observed a change for the worse in the way the department administration treated Phillips and testified that the treatment took a toll on Phillips such that "she's basically a different person." Phillips herself said that defendants' conduct made her feel like a fool and that she could not depend on Bowen to make decisions necessary for her to perform her job. Plaintiff testified that the pressure and stress she experienced even affected her ability to shoot and possibly pass firing range certifications, which were required for her to keep her job. Phillips said that defendants' conduct caused her stress so that she cried excessively, was sick to her stomach, had diarrhea, and avoided going to work. Phillips' boyfriend testified that plaintiff came home from work crying many nights, was ill in the bathroom two or three hours every night, found it difficult to handle the pressure of dealing with her work superiors, and "there's a lot of things that we were doing before that we really can't do now because a lot of times she doesn't feel good, upset stomach and just nervous."
 
 
 9
 The jury ruled in favor of plaintiff on her retaliation claim and awarded damages of $400,000 by assessing $200,000 each against Bowen and Woodcock. The district court denied defendants' motions for judgment as a matter of law and a new trial, and defendants now appeal. We review de novo the district court's decision regarding a motion for judgment as a matter of law, and we review the district court's decision regarding a motion for a new trial for abuse of discretion. Song v. Ives Labs., Inc., 957 F.2d 1041, 1046-47 (2d Cir.1992).
 
 DISCUSSION
 I. Retaliation
 
 10
 Defendants principally argue that Phillips failed to prove a violation of her First Amendment rights as a matter of law because her complaints and allegations concern her subjective beliefs of mistreatment and trivial incidents not amounting to actionable retaliation or harassment. According to defendants, the treatment that Phillips experienced "can be deemed incidents that normally occur in a working environment." We disagree. Although defendants have attempted to minimize and isolate the experiences about which Phillips testified, the jury was entitled to conclude that Phillips adequately described a pattern of nearly constant harassment by her supervisors that took place over a period of several years.
 
 
 11
 As is so often the case, the standard of review plays a critical role in our assessment of the record. As noted, we review de novo the district court's decision regarding a motion for judgment as a matter of law, applying the same Fed.R.Civ.P. 50 standard as the district court below. Song, 957 F.2d at 1046. Under that stringent standard, we do not weigh the credibility of witnesses or the evidence and grant judgment as a matter of law only where there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or... [there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." Id. (quotation marks and citation omitted).
 
 
 12
 In order to prove her First Amendment retaliation claim, plaintiff must show that (1) her speech was constitutionally protected; (2) she suffered from an adverse employment action; and (3) her speech was a motivating factor in the adverse employment determination regarding her. See Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999). Defendants only challenge the sufficiency of plaintiff's evidence on the second element of her claim and do not reach issues of protected speech or motive. "Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." Id. We also have held that lesser actions may meet the adversity threshold, but we have not explicitly defined what quantum of lesser actions constitutes an adverse employment action. Id; see also Bernheim v. Litt, 79 F.3d 318, 325 (2d Cir.1996).
 
 
 13
 We are extremely mindful that a merely discourteous working environment does not rise to the level of First Amendment retaliation. However, we do not believe that is what took place in this case. Our precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass. See Bernheim, 79 F.3d at 324-25.[1] Importantly, in this case the district court's instruction to the jury would not permit a verdict in favor of plaintiff merely for minor incidents. The district court instructed the jury that:
 
 
 14
 [t]o prove that harassment constitutes an adverse employment action, plaintiff must demonstrate that the actions allegedly taken by defendants created a working environment unreasonably inferior to what would be considered normal for that position. A position may become unreasonably inferior if there are repeated and severe incidents of harassment that, taken as a whole, would probably deter an average person from the exercise of their First Amendment rights.
 
 
 15
 This instruction borrows heavily from the First Circuit's decision in Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1218-19 (1st Cir.1989) (en banc). In that case, the First Circuit too recognized the need for plaintiffs to demonstrate a certain severity of harm so that minor incidents or changes in working conditions would not form the basis for a constitutional claim. Id. at 1217-20. Defendants cite favorably the legal standard in Agosto-de Feliciano, and we find that the case is generally consistent with Second Circuit precedent. Thus, we hold that in order to prove a claim of First Amendment retaliation in a situation other than the classic examples of discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand, plaintiff must show that (1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace. Although this standard borrows some language from the First Circuit's opinion in Agosto-de Feliciano, it merely clarifies the principles that we applied in Bernheim. Incidents that are relatively minor and infrequent will not meet the standard, but otherwise minor incidents that occur often and over a longer period of time may be actionable if they attain the critical mass of unreasonable inferiority.
 
 
 16
 Based on our review of the trial transcript, we hold that Phillips presented sufficient evidence of harassment, adverse working conditions and retaliatory incidents to support the jury's verdict. While the incidents — such as defendants' failure to provide her with an adequate bulletproof vest or proper instruction regarding transfer of a prisoner, or defendants' humiliating instruction to plaintiff about use of a time clock — may seem minor when viewed in isolation, a finder of fact looking at them collectively over a period of several years reasonably could find that they rise to the level of actionable harm. The jury heard the evidence and assessed the witnesses in person and was in the best position to judge the severity of defendants' conduct and the motives for their actions. Indeed, although we have before us only the dry record, we believe that defendants' animosity permeated plaintiff's work environment and their actions directly and adversely affected her daily working conditions in a substantial way. Because we find that adequate evidence supports the jury's verdict and nothing in the record leads us to believe that the jury's findings were the result of "sheer surmise and conjecture," we affirm the district court. See Song, 957 F.2d at 1046 (citation omitted).
 
 
 17
 We do not engage in a detailed rebuttal of the dissent, but we note that its arguments rest on its view of the trial evidence rather than the jury's. While conceding that we have applied the correct legal standard on review and that the district court correctly charged the jury, the dissent claims that the result in this case unduly extends the concept of First Amendment retaliation. This claim criticizes by implication the evidentiary inferences and credibility assessments that only the jury can make. The dissent labels plaintiff's complaints as "trivial" and states that no "reasonable person" would have experienced the reactions that plaintiff did, but the dissent does not contest that the district court's instructions demanded the jury to consider an "average person" and permitted a finding of liability only in the case of "repeated and severe incidents of harassment." The dissent speculates about a compromise verdict and about the effect of evidence that even appellants do not contend was erroneously before the jury. Finally, the dissent asserts that "[a]ffirmance in this case leaves the parameters of a judicially created constitutional claim to the subjective judgment of shifting groups of citizens who are called to jury service." Of course, leaving judgments of fact within the province of properly charged jurors is precisely the foundation of our legal system.
 
 
 18
 In a related argument, on their motion for a new trial defendants challenge the district court's instructions to the jury, which we review as whole to determine if they provide "a misleading impression or inadequate understanding of the law." BAII Banking Corp. v. UPG, Inc., 985 F.2d 685, 696 (2d Cir.1993) (quotation marks and citation omitted). Specifically, defendants contend that the district court improperly charged the jury that plaintiff had to prove her allegations by a preponderance of the evidence rather than by clear and convincing evidence. Defendants rely on Agosto-de Feliciano, which adopted the higher standard of proof regarding a detrimental change in plaintiff's working conditions but retained the preponderance standard on the issue of defendant's discriminatory motive. See Agosto-de Feliciano, 889 F.2d at 1220. Plaintiffs fail to cite any Second Circuit case law adopting a more stringent burden of proof in these circumstances. See Morris, 196 F.3d at 110 (citing preponderance standard). On this issue, we decline to follow the First Circuit, which believed that the higher burden of proof was "consistent with the First Amendment interest of the governmental employer" perhaps because the case dealt solely with the association clause of the First Amendment and political hires. Agosto-de Feliciano, 889 F.2d at 1214, 1220. We believe that the standard we adopted above, coupled with an instruction such as the one that the district court gave here, adequately protects the employer's own free speech or association interests.
 
 
 19
 In another challenge to the district court's instructions, defendants argue that Judge Kahn improperly described the substantive law because he failed to give the jury illustrations or examples of actionable conduct to guide its deliberations. Again, defendants rely on out-of-circuit precedent, but even that case cautioned that its hypotheticals were of limited use. Id. at 1218. While the district court's charge incorporated some of the First Circuit's descriptive language, the instruction as a whole comported with our precedent. See Bernheim, 79 F.3d at 325-26. We therefore reject defendants' challenges to the jury charge and find that no new trial was warranted.
 
 II. Evidentiary ruling
 
 20
 Defendants contend next that a new trial is necessary because the district court abused its discretion in admitting the testimony of Sandra Gansevoort, who testified about sexual harassment she experienced while working at the Saratoga County sheriff's office. Bowen and Woodcock claim that this testimony was irrelevant to plaintiff's retaliation claims and prejudiced the jury against them. "[W]e will not grant a new trial unless we find that the introduction of inadmissible evidence was a clear abuse of discretion and was so clearly prejudicial to the outcome of the trial that we are `convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" Luciano v. Olsten Corp., 110 F.3d 210, 217 (2d Cir.1997) (quoting Hygh v. Jacobs, 961 F.2d 359, 365 (2d Cir.1992)). "We measure prejudice by assessing error in light of the record as a whole." Id.
 
 
 21
 Assuming arguendo that the district court improperly admitted Gansevoort's testimony, any potential prejudice against defendants would have arisen in the context of Phillips' sexual discrimination claim. However, the record taken as a whole, reveals that defendants did not suffer clear prejudice. Indeed, the jury returned a split verdict — rejecting plaintiff's cause of action for sexual discrimination but accepting her retaliation claims — and accordingly displayed its ability to distinguish evidence. The district court's evidentiary and post-verdict rulings do not provide grounds for a new trial.
 
 III. Damages
 
 22
 Finally, defendants argue that the jury award of $400,000 was excessive because plaintiff failed to prove economic damages or physical injury and presented minimal evidence of emotional distress. We review the district court's refusal to reduce a jury award for abuse of discretion, but we cannot uphold an award that is so excessive that it shocks the judicial conscience. Raucci v. Town of Rotterdam, 902 F.2d 1050, 1058 (2d Cir.1990).
 
 
 23
 The district court, after hearing all of the evidence at trial, declined to overturn the award. We see no abuse of discretion in that decision. Plaintiff submitted evidence of ongoing harassment by each defendant over a five-year period. Phillips and her boyfriend testified in detail about her emotional distress, physical illness, and the effects of defendants' conduct on her lifestyle and relationships. Phillips' co-workers testified about the deterioration they observed in Phillips. Other less direct indicia of plaintiff's damages came from the defendants themselves, who unapologetically described their treatment of plaintiff. Those hearing this evidence at trial and in the best position to evaluation witness credibility — the trial jury and Judge Kahn himself — each determined that $400,000 was a fair assessment of plaintiff's damages. On this record the award was not excessive.
 
 CONCLUSION
 
 24
 For the forgoing reasons, we affirm the judgment of the district court.
 
 
 
 Notes:
 
 
 *
 The Honorable John S. Martin, Jr. of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 In support of their position, defendants improperly citeGarber v. New York City Police Dep't, 159 F.3d 1346 (2d Cir.1998), a summary order that parties may not cite as precedential authority. Defendants' citation to Diesel v. Town of Lewisboro, 232 F.3d 92, 109 (2d Cir.2000), also is incorrect because that case specifically did not concern an adverse employment action.
 
 
 Martin, District Judge, dissenting:
 
 25
 "[I]t would indeed be a Pyrrhic victory for the great principles of free expression if the Amendment's safeguarding of a public employee's right, as a citizen, to participate in discussions concerning public affairs were confused with the attempt to constitutionalize... employee grievance[s]."
 
 
 26
 Connick v. Myers, 461 U.S. 138, 154, 103 S.Ct. 1684, 1694, 75 L.Ed.2d 708(1983).
 
 
 27
 Because I believe that the affirmance of the judgment in this case results in just such a constitutionalization of employee grievances, I respectfully dissent.
 
 
 28
 In 1993, plaintiff, who was hired by the Sheriff of Saratoga County in 1981, and had by then worked for him for twelve years, walked into his office and told him that she did not believe he was adequately performing his job and that she would be supporting his opponent in the upcoming election. Plaintiff thereafter circulated nominating petitions for the opponent and was quoted in the press during the campaign, complaining that Sheriff Bowen had not provided her with a bullet-proof vest, although such vests had been provided to male deputies.
 
 
 29
 Not surprisingly, the Sheriff's attitude toward plaintiff changed, as apparently did the attitude of some of her co-workers. Plaintiff proved that the Sheriff yelled at her twice in the following two years, and that on one of these occasions he did not, in her opinion, adequately respond to a problem she was having while trying to deliver a prisoner to authorities in a nearby county. The jury found that this conduct violated plaintiff's First Amendment rights and ordered the Sheriff to pay her $200,000.
 
 
 30
 Plaintiff also contended that her First Amendment rights were violated by the Chief Deputy Sheriff. To support this claim, she proved that after she was quoted in the press on the bullet-proof vest issue, the Chief Deputy tried to measure her for a vest by using a straight ruler to measure her back, and that when the vest arrived, he directed her to wear it under her shirt even though she had to wear the shirt with one button open for a period of two weeks until a larger uniform shirt arrived. Plaintiff also offered evidence that at various times over a 2½ year period, the Chief Deputy (1) ordered her from the scene where a deranged man was being subdued;(2) yelled at her for improperly using the time clock; (3) delayed for three weeks paying her for 3 hours of overtime; and (4) conducted a counseling session with her at which he discussed various issues, all of which plaintiff conceded were matters of legitimate concern, although she felt that criticism of her conduct was not justified. The jury found that this conduct also violated plaintiff's First Amendment rights and ordered Chief Deputy Woodcock to pay plaintiff an additional $200,000.
 
 
 31
 I do not quarrel with the standard that my colleagues in the majority articulate in a case such as this, i.e., that the plaintiff must prove, using an objective standard, that "the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." Majority Op. at 8. I dissent because the plaintiff's evidence totally failed to meet this standard and a finding of First Amendment retaliation based on the relatively minor and infrequent incidents on which plaintiff relies extends the concept of First Amendment retaliation far beyond Supreme Court precedent or anything contemplated by this Court in Bernheim v. Litt, 79 F.3d 318, 325 (2d Cir.1996).
 
 
 32
 In Elrod v. Burns, 427 U.S. 347, 360, 96 S.Ct. 2673, 2683, 49 L.Ed.2d 547 (1976), and Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Supreme Court held that a state employee who has been terminated from his employment because of his political speech or affiliation can maintain a cause of action for violation of his First Amendment rights pursuant to 42 U.S.C. § 1983. Subsequently, in Rutan v. Republican Party, 497 U.S. 62, 75, 110 S.Ct. 2729, 2737, 111 L.Ed.2d 52 (1990), the Supreme Court found that "there are deprivations less harsh than dismissal that nevertheless press state employees and applicants to conform their beliefs and associations to some state-selected orthodoxy," and rejected the requirement that the state employer's action be the "substantial equivalent to dismissal." Accordingly, the Court found that "promotions, transfers, and recalls after layoffs" could not be used to punish First Amendment protected speech or political association. Id.
 
 
 33
 Both before and since the Rutan decision, the circuits have struggled to define a standard for claims involving lesser adverse employment actions that would require plaintiffs to allege matters that are both detrimental and clearly substantial. See, e.g., Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1218 (1st Cir.1989) (employer's actions must result in a work situation unreasonably inferior to the norm for the position); Id. at 1224 (Breyer, J., concurring and dissenting)(harm must be "severe"); Dahm v. Flynn, 60 F.3d 253, 257 (7th Cir.1994) (dramatic downward shift in skill level required for job can constitute an adverse employment action); Tao v. Freeh, 27 F.3d 635, 639 (D.C.Cir. 1994) (more burdensome promotion requirements); Bernheim v. Litt, supra, 79 F.3d at 327 (Jacobs, J., concurring) (action must be capable of being deemed a demotion).
 
 
 34
 In Bernheim, the plaintiff alleged that the defendant retaliated against her by
 
 
 35
 removing her from the positions of staff developer and librarian; assigning her to classroom work; reducing her preparation periods from two to one; assigning her to lunchroom duty; removing her belongings from her storage area; sending negative evaluation letters criticizing her work; failing to process insurance forms; and wrongfully accusing her of absenteeism. Bernheim also alleges that in retaliation for criticizing Litt, he assigned her to a fifth floor classroom with a schedule that required frequent trips to the main floor, even though he knew that she suffered from certain physical disabilities that made it difficult for her to climb stairs, namely, a herniated disc, a bulging disc, a fractured right knee and a loose body in her left knee.
 
 
 36
 79 F.3d at 324.
 
 
 37
 Even with respect to these allegations, the majority in Bernheim stated that it "agree[d] with the concurring opinion that a number of Bernheim's claimed damages and acts of retaliation treated separately would be trivial and do not rise to a constitutional violation." 79 F.3d at 326. Since the acts of retaliation alleged by Bernheim were more severe and pervasive than any of the incidents of alleged retaliation on which plaintiff relies, I view Bernheim as supporting reversal here rather than affirmance. See also Weeks v. New York State (Division of Parole), 273 F.3d 76, 85-86 (2d Cir.2001).
 
 
 38
 The differences between this case and Bernheim are best demonstrated by a more detailed review of the incidents of retaliation that I have set forth above in summary form. However, before turning to those incidents it should be noted that the majority lumps the alleged events together as the responsibility of "the defendants" although, except with respect to the time clock incident, there was no evidence that either of the defendants were involved in, or even aware of, the complained of conduct of the other. Moreover, whereas the majority seems to believe that plaintiff s case is strengthened by looking at the impact of these incidents "collectively over a period of years," I view the fact that these incidents were spread over a 2½ year period as evidence that there was no ongoing campaign to retaliate against plaintiff and that defendants' conduct did not "adversely [affect] her daily working conditions in a substantial way." Majority Op. at 110 (emphasis added).
 
 
 39
 Plaintiff alleges that the protected activity giving rise to the retaliation occurred in April 1993, when she told Bowen that she was supporting his opponent, Chris Morrell.
 
 
 40
 The first act of alleged retaliation did not occur until five months later, in September 1993. On that occasion, plaintiff was assigned to make an arrest on a civil warrant of commitment and arrange for the Albany County Sheriff's Department to take custody of the prisoner. This was an unusual procedure. After making the arrest, plaintiff called her office and asked her supervisor to contact the Albany County Sheriff's office to arrange for the transfer. She was told that Bowen said that she should make the arrangements herself. After she contacted the Albany County Sheriff's Office and was told that they had no one available to take the subject from her, she called her office again to ask what they wanted her to do. Ultimately, Bowen came on the line, told her to stop bothering the people in the office and just do her "goddam job," and slammed down the phone. Plaintiff testified that this incident made her feel foolish, and that she felt that Bowen was no longer "there" for her. While Bowen may not have been the ideal supervisor, and while his reaction did not reflect the proper sensitivity to his employee's dilemma, this brief loss of temper does not feature the hallmarks of a calculated act of retaliation.
 
 
 41
 In addition, although Bowen allegedly yelled at plaintiff during this and another incident, plaintiff acknowledged that he was a volatile person who yelled a good deal, and that he had yelled at her before the campaign ever took place. (A. at 1854a)("[B]ecause he's the type of man that will fly off the handle, and if you screw up, you screw up, and he's going to yell at you...."); (A. at 1905a) ("I've been screamed at before. And it's okay. He is a hard task master, but he's always been the Sheriff.").
 
 
 42
 The next incident of alleged retaliation, which involved the bullet-proof vest, began about one month later, in October 1993. After Plaintiff was quoted in newspaper articles as apparently criticizing Bowen over the fact that she had not been issued a bullet-proof vest, Chief Deputy Sheriff Woodcock approached her and asked her to try on three men's vests.[1] Plaintiff testified that when she complained that they did not fit properly and were uncomfortable, "I came back into [Woodcock's] office and I said are you going to order me to wear this vest? And he said no." (A. at 1861a). At this point, Woodcock took out the ruler and tried to measure her back, but plaintiff told him that would not work. Woodcock responded that they would have to get someone else to measure her.
 
 
 43
 There is clearly nothing about this incident that smacks of retaliation. Because plaintiff had complained in the press that she did not have a vest, it was natural that her superiors would take action to see that she got one. Woodcock did not force her to wear a vest that was uncomfortable and, since he only attempted to measure her back with the ruler, there was nothing harassing about his conduct. Nor was there anything that could amount to harassment in the fact that Woodcock twice contacted Plaintiff in December in order to get new measurements.
 
 
 44
 The only action relating to the vest that one could reasonably consider inappropriate occurred in March 1994, when the vest was finally delivered to plaintiff, At that time, the uniform shirt that plaintiff wore would not fully button over the vest, but Woodcock nevertheless insisted that she wear the vest. Thus, for approximately two weeks, plaintiff was forced to work with the middle button of her shirt open. While this may have been somewhat embarrassing, it apparently did not cause plaintiff serious distress since one of her witnesses testified that she and the plaintiff "laughed about it." (A.2444a). While Woodcock's action was inappropriate, this relatively brief incident was not so shocking as to sustain a claim of First Amendment retaliation.
 
 
 45
 While plaintiff also claims that for two years she was not given the outer shell that would have allowed her to wear the vest outside of her blouse, she never asked for one. Moreover, there is no evidence that anyone preferred to wear the vest outside the shirt, where it would be highly visible, rather than under the shirt, and there is some evidence that deputies preferred to wear the vest under their shirts. (A. 1867a-68a; 3055a). When ultimately plaintiff did complain that she could not wear the vest under her clothes in certain circumstances, the shell was produced. Thus, there is nothing to suggest that the failure to give her the outside shell earlier was part of a campaign of retaliation.
 
 
 46
 The next alleged act of retaliation occurred six months later in December 1994, when plaintiff was not paid for three hours of overtime. Not only was this a relatively insubstantial amount of time, but there is very little evidence that it was an act of retaliation. Chief Deputy Woodcock told her at the time that the overtime that was reflected in plaintiff's time card had not been paid because she had not obtained the necessary advance approval for overtime pay. Although plaintiff admitted that there were times when she had sought advance approval for overtime, she denied that advance approval was required in all circumstances.[2] In any event, when she complained to Woodcock that she had not been paid for the overtime and told him the reasons she had worked the hours, he told her to put it in writing. The overtime amount was included in a paycheck shortly thereafter.[3]
 
 
 47
 There was another incident of alleged retaliation in December 1994, in which plaintiff was ordered away from the scene where a man was apparently acting violently in reaction to a change in his medication. However, the order for plaintiff to leave the scene does not appear to have been unreasonable.
 
 
 48
 Although plaintiff had not been directed to respond to the incident, she claimed that she had been informed of it and knew the people involved. She said that as she was driving by the location, someone waved to her and she stopped. When plaintiff entered the home, four men — the subject's two sons and two ambulance attendants — were holding him on the floor. Plaintiff claims that she was able to calm the subject down by talking to him. She then received a radio message to leave the scene. While plaintiff, who was a Civil Deputy, criticizes the decision to order her from the scene, she knew that two Road Deputies, who regularly handle criminal matters and other dangerous situations, had been ordered to the scene. Plaintiff acknowledged that Road Deputies had training that Civil Deputies did not, and were equipped with pepper spray that could be used to subdue the subject. Moreover, there was no evidence that Woodcock knew that plaintiff had the situation under control when he gave the order for her to leave. Thus, it appears that it was appropriate for Woodcock to order a Civil Deputy away from a scene that appeared to be a dangerous situation involving a violent person, particularly where the situation could be handled by better-equipped and trained Road Deputies who were on their way. Even if this was poor judgment in light of the fact, unknown to Woodcock, that plaintiff allegedly had things under control, this spur-of-the-moment decision cannot reasonably be considered as part of a campaign of retaliation. See Diesel v. Town of Lewisboro, 232 F.3d 92, 109 (2d Cir.2000) ("Conduct that is properly initiated, reasonably executed, independently justified and equally administered-regardless of any animosity towards the plaintiff-does not give rise to a constitutional claim for retaliatory harassment.").
 
 
 49
 Plaintiff next complains that in January 1995, Bowen and Woodcock humiliated her by berating her in public over her use of the time clock. Apparently as a result of concerns that people were punching in and out on the time clock before and after the assigned hours in a manner that could indicate an entitlement to overtime, a directive was given by Woodcock to all employees that they should punch out on the hour. When, according to plaintiff, she punched out two minutes late, Bowen, who happened to be standing nearby, began to holler that she was not following Woodcock's directive. A short time later, when plaintiff was talking to another deputy, Woodcock came out and began hollering at her and brought her over to the punch clock in order to instruct her on its operation in a manner that she considered demeaning. While this incident does not reveal either Bowen or Woodcock to be the role model of a supervisor, this clearly spontaneous incident does not evidence a calculated plan to retaliate against plaintiff because she exercised her First Amendment rights a year and a half earlier, particularly given the abundant testimony that Bowen yelled at everyone.
 
 
 50
 The next incident of which plaintiff complains occurred a year later, in January 1996, when Woodcock and one of the lieutenants held a counseling session with the plaintiff concerning four areas of her performance. While plaintiff contended that this was harassment, and that she was not allowed to give explanations of the challenged conduct, she admitted that there was a factual basis for each of the areas in which her superiors raised concerns.[4] In any event, whatever the merits of the issues raised in the counseling session, this Court has held that "criticism of an employee ... is not an adverse employment action." Weeks v. New York State (Division of Parole), supra, 273 F.3d at 86.
 
 
 51
 The evidence with respect to each of the alleged incidents of retaliation has been set forth in considerable detail to demonstrate that affirmance of the jury verdict in this case effectively establishes a new standard that goes far beyond past precedent, and creates a constitutional cause of action to vindicate an employee's trivial complaints about an unpleasant working environment. Smart v. Ball State University, 89 F.3d 437, 441 (7th Cir.1996) ("not everything that makes an employee unhappy is an actionable adverse action"). See also Bernheim v. Litt, supra, 79 F.3d at 327 (Jacobs, J., concurring).
 
 
 52
 In order to support a claim pursuant to § 1983, the alleged retaliatory actions must be so severe that they would cause a reasonable person to feel constrained to refrain from, or otherwise to modify his exercise of, constitutionally protected speech and political activities in the future. See Bart v. Telford, 677 F.2d 622, 625 (7th Cir.1982) (It would "trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise.").
 
 
 53
 When defining the types of actions that would rise to this level, it must be considered that a public employee cannot reasonably expect that he or she could, as for example in this case, actively campaign against her employer and nevertheless, when the dust clears, remain on exactly the same personal terms as she enjoyed previously. As the First Circuit stated in Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1217 (1st Cir.1989),
 
 
 54
 less serious occurrences — social preference or pressure, nuances affecting status and prestige, and articulated or indirectly manifested slurs and gibes — may be an all too real by-product of our long-standing organization of political life into two or more parties. We believe it appropriate to require the citizen who believes and affiliates with a political party to develop a suitably thick skin to withstand the rigors of our societal, often highly politicized, life. (citation omitted).
 
 
 55
 See also Diesel v. Town of Lewisboro, 232 F.3d 92, 109 (2d Cir.2000)(A § 1983 plaintiff "may not `demand that the court suppress all manifestations of annoyance by a person' offended by the plaintiff's protected speech.").
 
 
 56
 While the majority apparently finds significance in the testimony concerning the physical effects that plaintiff allegedly suffered because of the stress she found in her working environment,[5] the appropriate inquiry has to be what the effect of the alleged acts of retaliation would be on a reasonable person, rather than the subjective reaction of this particular plaintiff. See Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1217 (1st Cir.1989) (inquiring whether "the government's actions are sufficiently severe to cause reasonably hardy individuals to compromise their political beliefs and associations in favor of the prevailing party"); Bart v. Telford, 677 F.2d 622, 625 (7th Cir.1982) (noting that it would "trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise..."). The six incidents described above, which occurred over a 2½ year period, would not be expected to create such dramatic effects on a reasonable person.
 
 
 57
 Moreover, in this case there were several factors present which no doubt contributed to plaintiff's feelings of isolation and her subjective feelings of victimization, but which cannot fairly be linked to the alleged acts of retaliation by the defendants. First, plaintiff presented evidence at trial of several incidents to support her claims of discrimination on the basis of sex, which were rejected by the jury.[6] In addition, there was testimony concerning events that plaintiff perceived as retaliatory, having to do with the loss of pay while on injury related leave and the denial of promotion opportunities, which the trial judge found were not in any way improper. While these various incidents may have made plaintiff unhappy and even physically ill, such misinterpretations of events and feelings of isolation cannot be used to support a claim that she has been deprived of her constitutional rights.
 
 
 58
 In addition, there was a good deal of evidence introduced at trial regarding hostility emanating from plaintiff's co-workers, but no evidence that either of the defendants were responsible for this conduct. Given the fact that plaintiff was a highly visible opponent of the Sheriff, it is likely that some of plaintiff's co-workers thought that it was not in their interest to be perceived as friendly to her. It may also be that some of her co-workers reacted negatively to her because they believed that she had unfairly attacked the Sheriff. At least one female former co-worker testified that plaintiff asked her to contact the press and state that she had resigned because she had not been provided with a bullet-proof vest, even though that was not the case. (A2787a-89a). Thus, whatever plaintiff's physical symptoms may have been, there are a number of factors that could have contributed to them, which are not chargeable as acts of retaliation by the defendants.
 
 
 59
 It should also be noted that the evidence of the hostility of co-workers and the evidence concerning plaintiff's claim for sick pay and the denial of promotional opportunities was all paraded before the jury, even though it could not be fairly charged to defendants. Thus, while I agree with the majority that there was no error in the charge of the Court, I am far from convinced that in reaching its verdict the jury was properly focused on the specific acts that were relevant to the claims of First Amendment retaliation.
 
 
 60
 In any event, the issue here is not whether there were acts that a member of a jury might consider to constitute retaliation for plaintiff's support of the Sheriff's political opponent. The issue is to define the proper boundaries of a judicially created cause of action for retaliation for the exercise of constitutional rights. See Carlson v. Green, 446 U.S. 14, 27-28, 100 S.Ct. 1468, 1476-77, 64 L.Ed.2d 15 (1980)(Powell, J., concurring)(stating, inter alia, that when the courts take on such legislative tasks, they should take into account a range of policy considerations at least as broad as those a legislature would consider with respect to an express statutory authorization of a traditional remedy). Affirmance in this case leaves the parameters of a judicially created constitutional claim to the subjective judgment of shifting groups of citizens who are called to jury service.
 
 
 61
 In upholding a verdict for retaliatory harassment where no truly "adverse" employment action exists, and where the actions complained of are trivial in nature and exhibit little direct correlation to the plaintiff's protected speech, we are opening the door to a limitless number of suits founded in little more than hurt feelings and broken friendships. I would, therefore, reverse the judgment of the District Court and direct that the Complaint be dismissed.
 
 
 
 Notes:
 
 
 [1]
 Other than ordering Woodcock to obtain a vest for plaintiff, Sheriff Bowen had no personal involvement in the vest episode
 
 
 [2]
 On cross, plaintiff stated that approval was not required for only a "few minutes" of overtime. (A. at 2057a-58a.) Here the overtime periods were 14 minutes, ½ hour, 1¼ hour, and 1 hour. Plaintiff also testified that she typically did not work overtime, and that her partner would usually be sent to relieve her if she was still in the field when her shift ended
 
 
 [3]
 Although plaintiff claims that the payment was made only because she contacted the Labor Board, and Woodcock received a call from the Labor Board, there is no evidence that plaintiff would not have been paid the overtime absent the phone call from the Board
 
 
 [4]
 One concern was that plaintiff was not using the time clock to punch in, but was writing her start time on her card. This obvious violation of time clock procedure was a fair subject of discussion between an employee and her supervisors
 The next item of discussion was her failure to properly use her radio to sign in and out. Plaintiff testified that her superiors told her that this procedure was for her own safety, and she apparently does not dispute that fact. Her response was that for five months the radio (which she shared with another officer) often did not work and that they should have known that. Again, discussing this safety issue with an employee is hardly evidence of retaliation.
 The third item discussed in the counseling session related to plaintiff not wearing her ballistic vest. Plaintiff acknowledged that she had failed to wear her vest as required on a previous occasion, but complained that another deputy had not been criticized for similar conduct. While the criticism of plaintiff in this regard may or may not have been warranted, discussing the issue with her hardly qualifies as an act of retaliation.
 The fourth item referred to plaintiff's tardiness in signing on the air at the start of her shift. Plaintiff admitted that during winter storms she had to shovel snow off the car, and therefore she sometimes signed on 25 minutes or more after her shift had begun. Although plaintiff claims that she was not permitted to explain her actions, once again this topic is not an inappropriate one to raise during an employee counseling discussion.
 
 
 [5]
 While obviously it was for the jury to assess plaintiff's testimony that she was throwing up and had diarrhea as a result of the harassment, it is interesting that plaintiff did not even mention any adverse effects in her direct testimony. On re-direct, her testimony indicated that she had experienced physical symptoms of stress, but they seem to be related more to the lawsuit than to the actual incidents of retaliation. For example, she testified that she had been doing "an awful lot of crying lately" and that she eats "a jar of Tums a day." Although she describes several symptoms of stress, she does not relate any of them to any particular event or describe their frequency or durationSee Brady v. Fort Bend Cty., 145 F.3d 691, 718-20 (5th Cir. 1998), cert. denied, 525 U.S. 1105, 119 S.Ct. 873, 142 L.Ed.2d 774 (1999).
 
 
 [6]
 Although the majority states that defendants were not prejudiced by the admission of this evidence, Majority op. at 10, since the jury found against the plaintiff on her sexual harassment claims, it should be noted that the concept of a compromise verdict is not unheard of in our jurisprudence