Joy ST. LEDGER, Plaintiff,

v.

**AREA COOPERATIVE EDUCATION- AL SERVICES et al., Defendants.**

No. Civ.A. 3:99 CV 2212 (CFD).

United States District Court, D. Connecticut.

July 25, 2002.

John R. Williams, David G. Toro, Williams & Pattis, New Haven, CT, for Plaintiff.

James M. Sconzo, Wendi L. Boyden, Halloran & Sage, Hartford, CT, Michael Peter McKeon, Sullivan, Schoen, Campane & Connon, Hartford, CT, Michelle L. Treadwell, Fairfield, CT, for Defendants.

## RULING ON MOTION FOR SUMMARY JUDGMENT

DRONEY, District Judge.

The plaintiff, Joy St. Ledger, brought this action against the defendants, Area Cooperative Educational Services, Peter Young, and Cheryl Saloom, pursuant to 42 U.S.C. § 1983, alleging that the defendants retaliated against her in violation of the First Amendment, deprived her of the equal protection of the laws, violated the Rehabilitation Act, 29 U.S.C. § 794, and intentionally and negligently inflicted emotional distress upon her in violation of Connecticut state law.

On March 27, 2001, this Court dismissed the plaintiff's Rehabilitation Act, negligent infliction of emotional distress, and equal protection claims, but denied the defendants' motion to dismiss, or in the alternative, motion for summary judgment on, the plaintiff's First Amendment retaliation and intentional infliction of emotional distress claims, without prejudice to the defendants renewing their motion for summary judgment in light of the recent U.S. Supreme Court decision, *Brentwood Academy v. Tennessee Secondary Sch. Athletic Assoc.*, 531 U.S. 288, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). The defendants have since renewed their motion for summary judgment on the plaintiff's claims of First Amendment retaliation and intentional infliction of emotional distress, and it is considered here.

## I. Facts[1]

Defendant Area Cooperative Educational Services, Inc. ("ACES") is a "regional educational service center" approved by the Connecticut State Board of Education pursuant to Conn.Gen.Stat. § 10–66a *et seq.* It places children with special needs in educational programs and staffs those programs. ACES services its member boards of education of Ansonia, Bethany, Branford, Cheshire, Derby, East Haven,

1. The following facts are based on the parties' Local Rule 9(c) Statements and other summary judgment papers and are undisputed unless otherwise indicated.

Hamden, Meriden, Middletown, Milford, Naugatuck, New Haven, North Branford, North Haven, Orange, Oxford, Regional Districts 6, 13, and 16, Seymour, Shelton, Wallingford, Waterbury, West Haven, Wolcott, and Woodbridge. Defendant Peter Young is the Executive Director of ACES and defendant Cheryl Saloom is the Deputy Executive Director of ACES.

On September 1, 1971, defendant Young hired the plaintiff, Joy St. Ledger, as a speech therapist. From September 1973 to June 1983, St. Ledger was a coordinating special education teacher in ACES' autistic program; from June 1983 to June 1993, she was a coordinator in ACES' Severe Communication & Behavior Disorder ("SCBD") program. In 1992, St. Ledger became Director of ACES' Noncategorical Communication Language Preschool ("NCLP") program, and in 1995, she took on the additional role of Director of the SCBD program. In her role as Director of these two programs, St. Ledger's primary responsibilities included assisting in interviewing and hiring program staff, supervising that staff, and working with them to develop individualized education plans ("IEPs") for special education students. From 1990 to the present, defendant Saloom has been St. Ledger's direct supervisor.

St. Ledger was relieved of her role as Director of the NCLP program in 1996. At that time, Saloom informed St. Ledger that she observed a "lack of leadership skills" in her communication, policy and procedures, and in her judgment. In October 1997, Young informed St. Ledger that her salary increase was being withheld until she achieved the goals set for the 1997–98 school year.

In February 1998, St. Ledger's co-workers told Young and Saloom that St. Ledger had cancer and that they felt that the defendants had been unsympathetic to her. Saloom was also told that St. Ledger had requested that a school nurse, Annette Pompano, administer injections to St. Ledger in connection with her chemotherapy treatments. Young and Saloom met with St. Ledger to address these issues. St. Ledger confirmed that she had breast cancer, but stated that it would not affect her ability to perform her job. At that time, St. Ledger contends, Young screamed at her: "You're making a fool of this office by not telling us you have cancer! Annette has better things to do than give you a shot." St. Ledger also maintains that Saloom stated: "I want to know all the details, but not the gory details," and made comments about St. Ledger's hair and lack of energy.[2]

In June 1998, the salary increase withheld in 1997 was restored to St. Ledger. However, St. Ledger claims that between February and April 1999, the defendants ordered her to "further their unlawful racial discrimination" of an African–American co-worker by giving him negative performance evaluations when they were not deserved. St. Ledger states that she refused and was then "denounced" by Saloom and Young. In August 1999, Young transferred St. Ledger from Director of the SCBD program to the position of Director of Collaborative Programs. This new position required St. Ledger to supervise and coordinate programs that transition children with special needs to special education classes in regular schools. St. Ledger contends that the new position was not equivalent to her former position in benefits and opportunities.

On November 8, 1999, St. Ledger filed the present suit. As mentioned above, St. Ledger asserts that, in retaliation for her

**2.** Young and Saloom deny making these statements.

refusal to give negative evaluations to an African–American employee of ACES, the defendants "denounced" St. Ledger and changed her from Director of the SCBD program to Director of Collaborative Programs. St. Ledger also alleges that actions by the defendants which are described above caused her severe emotional harm.

## II. Summary Judgment Standard

In the context of a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." *Miner v. City of Glens Falls,* 999 F.2d 655, 661 (2d Cir. 1993) (internal quotation marks and citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, but omitting internal quotation marks), *cert. denied,* 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"The nonmovant must do more than present evidence that is merely colorable, conclusory, or speculative and must present 'concrete evidence from which a reasonable juror could return a verdict in his favor.'" *Alteri v. General Motors Corp.,* 919 F.Supp. 92, 94–95 (N.D.N.Y.1996) (quoting *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505). A party may not create its own "genuine" issue of fact simply by presenting contradictory or unsupported statements. *See Securities & Exch. Comm'n v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must present "significant probative evidence to create a genuine issue of material fact." *Soto v. Meachum,* Civ. No. B–90–270 (WWE), 1991 WL 218481, at *6 (D.Conn. Aug. 28, 1991).

In ruling on a motion for summary judgment, the Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich,* 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991); *see also Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992). Additionally "[w]here, as here, the non-movant bears the burden of proof at trial, the movant can satisfy its burden of production by pointing out an absence of evidence to support an essential element of the non-movant's case." *Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268, 270 (2d Cir.1999).

## III. Discussion

**A. First Amendment Retaliation**

### Claim[3]

In their summary judgment motion, the defendants dispute whether ACES or the individual defendants, Peter Young and Cheryl Saloom, were engaged in "state action" when they allegedly violated St. Ledger's First Amendment rights. In the alternative, the defendants argue that (1) ACES is entitled to Eleventh Amendment immunity, (2) Young and Saloom are entitled to qualified immunity, and (3) St. Ledger has failed to create a genuine issue of material fact as to whether she engaged in speech protected by the First Amendment and whether she suffered an adverse employment action in retaliation for engaging in such speech. Each ground will be considered below.

### 1. State Action

■ It is a basic tenet of constitutional law that the First Amendment applies only to individuals or entities engaged in "state action." *See Gorman–Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 552 (2d Cir.2001). The purpose of the "state action" requirement is to "preserv[e] an area of individual freedom by limiting the reach of federal law and avoi[d] the imposition of responsibility on a State for conduct that it could not control, but also to assure that constitutional standards are invoked when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Brentwood Academy v. Tennessee Secondary Sch. Athletic Assoc.*, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (internal quotations and citations omitted) (alterations in original). The threshold question here is whether ACES and the two individual defendants engaged in state action and are

thus subject to First Amendment restrictions.

■ In *Brentwood*, the Supreme Court recently clarified the test for "state action" as it had developed through *National Collegiate Athletic Assn. v. Tarkanian*, 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988), *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), and *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). The Court noted that "[w]hat is fairly attributable [as state action] is a matter of normative judgment, and the criteria lack rigid simplicity.... [N]o one fact can function as a necessary condition across the board ... nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason...." *Brentwood*, 531 U.S. at 295–96, 121 S.Ct. 924. Reviewing the tests for "state action" that had previously been set forth, the Court identified a "host of facts" which bear on whether an activity can be attributable to a state: "when the state exercises its coercive power or significant encouragement, when a private actor is a willful participant in joint activity with the state, when an entity is controlled by the state or an agency thereof, when an entity has been delegated a public function by the state, when an actor is entwined with governmental policies, or when the government is entwined in the entity's management or control." *Gorman–Bakos*, 252 F.3d at 552 (citing *Brentwood*, 531 U.S. at 296, 121 S.Ct. 924).

With these principles in mind, the Supreme Court in *Brentwood* found that the Tennessee Secondary School Athletic Association (the "Association"), which was comprised of member schools in the State

---

**3.** The Court notes that St. Ledger's complaint does not set forth a cause of action for retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, as amended by the Civil Rights Act of 1991 ("Title VII").

of Tennessee and regulated interscholastic sports among its members, engaged in state action when it enforced a rule concerning the recruitment of student-athletes. The Court held that the Association's "regulatory activity may and should be treated as state action owing to the pervasive entwinement of the state school officials in the structure of the association, there being no offsetting reason to see the [A]ssociation's acts in any other way." *Brentwood,* 531 U.S. at 291, 121 S.Ct. 924.

The Court found that eighty-four percent of the member schools of the Association were public schools. Additionally, the Court noted, under the Association's by-laws, each member school was represented by its principal or a faculty member, who selected members of the Association's legislative council and board of control from eligible principals, assistant principals, and superintendents. The Court found that public school officials not only controlled, but "overwhelmingly performed, all but the purely ministerial acts" by which the Association existed and functioned in practical terms. *See id.* at 298–99, 121 S.Ct. 924. The Court also noted that the Association's staff, although not paid by the State, were eligible to join the State's public retirement system for its employees, and that a member of the State Board of Education was an ex-officio member of the Association's board.

■ The defendant here, Area Cooperative Educational Services, Inc. ("ACES"), is similar for the purposes of the state action analysis to the Tennessee Secondary School Athletic Association in its organization, regulation, and funding. Connecticut General Statutes §§ 10–66a *et seq.* provide the authority for the creation, op-

eration, and management of regional educational service centers such as ACES. The statutes provide, *inter alia,* that a regional educational service center may be established by a group of local boards of education after approval by the State Board of Education, and the management of the center shall be the responsibility of a board composed of at least one member from each member board of education. The statutes provide further that the "State Board of Education shall encourage the formation of a statewide system of [such] centers and shall adopt regulations with respect to standards for review and approval of [such] centers." Conn.Gen. Stat. § 10–66j. The obvious purpose of such a regional center is to more effectively and efficiently educate certain special needs students from its member local school systems.

As to its management, the regional educational service center's board may "designate from its membership an executive board which shall have such powers as the board of the regional educational center may delegate and which are consistent with this part."[4] Conn.Gen.Stat. §§ 10–66a, 10–66b.

Connecticut General Statute § 10–66c sets forth the powers of the board of a regional educational service center and states that it "shall be a public educational authority acting on behalf of the state of Connecticut." The board's powers include the following:

the power to sue and be sued, to receive and disburse private funds and such prepaid and reimbursed federal, state and local funds as each member board of education may authorize on its own be-

---

**4.** Defendants Peter Young and Cheryl Saloom were appointed to the ACES' executive board, presumably through this authority. Young is also an "ex-officio nonvoting member of the

Board [of Directors of ACES] and subcommittees thereof, and serves as Secretary and Treasurer of the Board [of Directors]."

half, to employ personnel, to enter into contracts, to purchase, receive, hold and convey real and personal property and otherwise to provide the programs, services and activities agreed upon by the member boards of education ... to establish policies for the regional educational service center, to determine the programs and services to be provided, to employ staff including a director of the center, to prepare and expend the budget, and within the limits authorized under this section, to provide for the financing of the programs and projects of the regional service center.

Conn.Gen.Stat. § 10–66c. Section 10–66e provides that the costs and expenditures of the regional educational service center "shall be shared jointly by the participating boards of education." Conn.Gen.Stat. § 10–66e.

In light of ACES' close and substantial "entwinement" with the State, the Court concludes that ACES and the individual defendants, Peter Young and Cheryl Saloom, were engaged in "state action" when they allegedly violated St. Ledger's constitutional rights. Like the Association in *Brentwood,* ACES' membership is comprised of public schools (local boards of education) and ACES' Board of Directors is composed of members from these public school boards. *Cf. Brentwood,* 531 U.S. at 298–300, 121 S.Ct. 924. Most of ACES' revenues comes from the local and State boards of education. *See id.* The State also encourages the formation of centers like ACES and provides regulations that govern ACES. *See id.* In sum, as in *Brentwood,* "[t]he entwinement down from the State Board [of Education] is therefore

unmistakable, just as the entwinement up from the member public schools is overwhelming." *Id.* at 302, 121 S.Ct. 924. As *Brentwood* provides, "[e]ntwinement will support a conclusion that an ostensibly private organization ought to be charged with a public character and judged by constitutional standards." *Id.*

Finally, while the majority opinion in *Brentwood* suggests that a Court should consider whether an actor's "entwinement" with State had an impact on the unconstitutional action at issue, the entwinement of the State here is so pervasive that ACES should be treated as a state entity for all purposes, including its personnel decisions, especially in light of the State's significant encouragement and delegation to ACES of its function of carrying out public education. As mentioned, regional centers such as ACES were created so that the local school districts could more effectively carry out their responsibility for educating special needs students.[5] Accordingly, the Court finds that, as a matter of law, the defendants engaged in state action when they allegedly violated St. Ledger's First Amendment rights.

### 2. Merits of First Amendment Claim

The Court concludes, however, that St. Ledger's First Amendment claim fails on the merits because she has failed to create a genuine issue of material fact that she suffered an adverse employment action by her transfer to the Directorship of Collaborative Programs or her "denouncement" by the defendants.[6]

██ St. Ledger asserts that, in retaliation for her persistence in giving positive

---

5. The Amended Agreement Creating ACES states that ACES was established to "more efficiently or effectively [carry] out on a regional basis" those duties required of the member boards of education by Connecticut state statute. Pl.'s Exh. A at A–1.

6. In light of the Court's holding as to the merits of St. Ledger's First Amendment claim, it is unnecessary for the Court to reach the issues of ACES' Eleventh Amendment immunity and the individual defendants' qualified immunity.

evaluations and her refusal to give negative evaluations to an African–American employee of ACES, the defendants "denounced" her and transferred her from Director of the SCBD program to Director of Collaborative Programs.[7] When the First Amendment rights of a public employee are disputed, the court must balance the employee's right to comment on matters of public concern with the government's interest as an employer to effectively and efficiently provide public services. *See Bernheim v. Litt,* 79 F.3d 318, 324 (2d Cir.1996) (citing *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) and *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). A public employee making a First Amendment claim based on activity implicating freedom of association and free speech must:

> initially demonstrate by a preponderance of the evidence that: (1) his [activity] was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his [activity] and the adverse employment determination against him, so that it can be said that his [activity] was a motivating factor in the determination. If the plaintiff establishes these factors, the defendant has the opportunity to show by preponderance of the evidence that it would have taken the same adverse action even in the absence of the protected conduct.

*Gorman–Bakos,* 252 F.3d at 553 (quoting *Morris v. Lindau,* 196 F.3d 102, 110 (2d

Cir.1999) (basing this standard on that set forth in *Mount Healthy City Sch. Dist. Bd, of Educ. v. Doyle,* 429 U.S. 274, 283–87, 97 S.Ct. 568, 50 L.Ed.2d 471) (1977)); *see Blum v. Schlegel,* 18 F.3d 1005, 1010 (2d Cir.1994); *Ezekwo v. NYC Health & Hosps. Corp.,* 940 F.2d 775, 780–81 (2d Cir.1991), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991).

▪ A public employee's speech is constitutionally protected only when it can "be fairly characterized as constituting ... a matter of· public concern." *Morris,* 196 F.3d at 110 (quoting *Connick,* 461 U.S. at 140, 103 S.Ct. 1684). Assuming as true the evidence presented by St. Ledger regarding her refusal to change her employment evaluations, the Court concludes that the exercise of St. Ledger's right to free speech regarded a matter of public concern. *See, e.g. Connick,* 461 U.S. at 148 n. 8, 103 S.Ct. 1684 (noting that the right to protest racial discrimination is of public concern).

As noted above, however, St. Ledger must also establish that she suffered an adverse employment decision and that a causal connection existed between her free speech and the adverse employment determination against her. *See Gorman–Bakos,* 252 F.3d at 553. As mentioned, St. Ledger claims that, in retaliation for her exercise of free speech, her employment was transferred and she was "denounced" by the defendants.[8]

In *Phillips v. Bowen,* 278 F.3d 103, 109–11 (2d Cir.2002), the Second Circuit clarified the Circuit's definition of "adverse

---

**7.** Though St. Ledger's complaint mentions several other allegedly "adverse" employment actions—e.g., removing her as NCLP Director, withholding her pay increase, making demeaning and cruel remarks regarding her cancer, giving her unfavorable job evaluations and assignments, insulting her, and concealing favorable reports of her work—such actions are alleged to have occurred prior to the

exercise of her free speech in connection with her co-worker's employment evaluations and thus cannot form the basis for her First Amendment retaliation claim.

**8.** Additionally, though St. Ledger states that in October 1999 Saloom told her that she intended to take away St. Ledger's vacation days, St. Ledger does not state in her affidavit

employment action" as it applies to First Amendment retaliation claims: a plaintiff may prove "adverse employment action" either by presenting evidence of the "classic examples" of discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand, *see Morris,* 196 F.3d at 110, or by showing that "(1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." *Phillips,* 278 F.3d at 109; *see also Bernheim,* 79 F.3d at 324–26 (stating that conduct that impairs the plaintiff's reputation, opportunities for advancement, and earning potential may constitute adverse employment action). "Incidents that are relatively minor and infrequent will not meet the standard, but otherwise minor incidents that occur often and over a long period of time may be actionable if they attain the critical mass of unreasonably inferiority." *Phillips,* 278 F.3d at 109.

■ The defendants' transferring St. Ledger to a different position is a "classic example" of "adverse employment action," if it truly was "adverse" to her. *See Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000). "[A] transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career." *Id.*

■ With regard to St. Ledger's transfer to the position of Director of Collaborative Programs, St. Ledger states in her affidavit that:

> ... I was given a dirty and very old desk, a non-functioning computer, no private office, and no file cabinet so that my papers had to be stored in a box.... Because I had no computer, I was forced to ask a secretary to type up the minutes I had to take at the various collaborative meetings which were a part of my job. When defendant Saloom learned about that, she ordered me to "do your own typing." When I explained that I was unable to do so because the defendant had deprived me of a computer, she responded: "Find one." As a result, I was forced to go at night to the business office of a friend and use the computer there.

St. Ledger Aff. at ¶ 5. Based on this showing, the Court concludes that the defendants' transfer was not "adverse" to St. Ledger. *See Galabya,* 202 F.3d at 640. St. Ledger has presented no evidence that her new position as Director of Collaborative Programs was not materially less prestigious than her prior position as Director of the SCBD program, or a demotion, or less suited to St. Ledger's skills and expertise. St. Ledger's base salary, benefits, and opportunities for advancement also do not appear to have been affected. As well, it appears that the position was commensurate with her experience and qualifications as an administrator and there has been no evidence presented of a material change in the nature of work she performed. Furthermore, the incidental changes in St. Ledger's daily working environment are not significant enough to amount to an adverse employment action. Therefore, the Court concludes that the transfer and its effects were not an "adverse employment action" as defined by the relevant case law.

St. Ledger also claims that "in retaliation for my said actions, defendant Young ordered me into his office and denounced me, saying: 'You have no leadership skills. The staff that do support you want to maintain the status quo.... Pack up and be out of your office by Tuesday.'" *Id.* This action also does not constitute any of the "classic examples" of adverse employ-

that any vacation days were actually taken away at this time.

ment action. *See Morris,* 196 F.3d at 110 (enumerating the classic examples of discharge: refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand). Additionally, a reasonable juror could not find that this action permeated her work environment and "directly and adversely affected her work conditions in a substantial way," such that her working environment was unreasonably inferior and adverse when compared to a typical or normal workplace. *Phillips,* 278 F.3d at 109.

Accordingly, St. Ledger has not presented sufficient evidence to create genuine issues of material fact that the alleged actions taken by the defendants constitute "adverse employment actions" for the purposes of her First Amendment retaliation claim. Therefore, St. Ledger's First Amendment retaliation claim must fail.

### B. Remaining State Law Claim

The Court further declines to exercise supplemental jurisdiction over St. Ledger's emotional distress claim on the ground that it has dismissed all claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3); *Spear v. Town of West Hartford,* 771 F.Supp. 521, 530 (D.Conn.1991) ("[A]bsent unusual circumstances, the court would abuse its discretion were it to retain jurisdiction of the pendant state law claims on the basis of a federal question claim already disposed of...."), *aff'd,* 954 F.2d 63 (2d Cir.), *cert. denied,* 506 U.S. 819, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992).

### IV. Conclusion

For the preceding reasons, the defendants' renewed motion for summary judgment [Doc. # 52] is GRANTED.

The Clerk is directed to close the case.