Bernard BRANCH, Plaintiff,

v.

GUILDERLAND CENTRAL SCHOOL DISTRICT and Paul Pristera, in his individual and official capacity, Defendants.

No. 02–CV–218.

United States District Court, N.D. New York.

Jan. 10, 2003.

Deily, Dautel & Mooney, LLP, Attorney for Plaintiff, Albany, Lisa Joslin, Esq.

Thuillez, Ford, Gold & Johnson, Attorney for Defendant Paul Pristera, Albany, Richard A. Kohn, Esq.

Hancock & Estabrook, LLP, Attorney for Defendant Guilderland School District, Syracuse, Renee L. James, Esq., John Monahan, Esq., Of Counsel.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

### I. INTRODUCTION

Plaintiff, Bernard Branch ("plaintiff"), brought suit against defendants, Guilderland Central School District ("school district") and Paul Pristera ("Pristera"), in both his individual and official capacity, alleging eight causes of action.[1] Pursuant to Fed.R.Civ.P. 12(b)(6), the school district has moved to dismiss plaintiff's *first* and *second* causes of action, and Pristera has moved to dismiss plaintiff's *fifth* cause of action.[2] Those causes of action, as asserted in the Amended Complaint, allege the following:

In his *first* cause of action, plaintiff alleges, as against the school district, retaliation for his complaining of Pristera's workplace conduct and for plaintiff's filing of

---

1. Plaintiff's *third* and *sixth* causes of action were withdrawn by stipulation. *See* Docket No. 33.

2. Plaintiff's other remaining causes of action, though not relevant here, are as follows. In his *fourth* and *seventh* causes of action, plaintiff alleges retaliation for his complaining of Pristera's workplace conduct and for plaintiff's filing of administrative charges, in violation New York Executive Law §§ 296(1)(e), 296(7). By stipulation, plaintiff has limited these claims to conduct occurring after July 2, 1999. *See* Docket No. 33. In his *eighth* cause of action, plaintiff has moved for attorney's fees pursuant to 42 U.S.C. § 1988.

administrative charges, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

In his *second* cause of action, plaintiff alleges, as against the school district, retaliation for his exercise of freedom of speech rights and for his filing of administrative charges, in violation of 42 U.S.C. § 1983.

In his *fifth* cause of action, plaintiff alleges, as against Pristera, retaliation for his exercise of freedom of speech rights, in violation of 42 U.S.C. § 1983.

The parties have fully briefed the relevant issues, and oral argument was heard on October 25, 2002, in Albany, New York. Decision was reserved.

## II. *FACTUAL BACKGROUND*

Taken from plaintiff's amended complaint, as is required when disposing of motions made pursuant to Rule 12(b)(6), the following comprise the facts essential to disposing of defendants' motions.

In September of 1994, plaintiff began working for the school district as a Bus Driver Substitute and then, beginning a month later, as a Bus Driver. In September of 1995, he was appointed to the position of Vehicle & Traffic § 19–A School Bus Trainee ("19–A position"). Beginning in 1996, Pristera, who was the school district's Transportation Director, in the presence of plaintiff and others, began making crude and offensive, sexually explicit, gender-based comments about his female charges. During the summer and fall of that same year, plaintiff voiced his complaints about Pristera's behavior to Christine Sagendorf ("Sagendorf"), the school district's Assistant Transportation Supervisor. He also discussed the topic with several co-employees, and with an attorney from the transportation employees' bargaining unit.

Plaintiff alleges that the retaliation against him began in October of 1997, when Pristera, after learning of the complaint, denied him access to files he needed to update and maintain in conjunction with his 19–A position, unless he had special permission from Karen Roennpagel ("Roennpagel"), the school district's Head Trainer. That same month, plaintiff's union representative met with Pristera to discuss the issue. Pristera told the union representative that plaintiff had lodged a harassment complaint against him, and that the access denial orders came from Blaise Salerno ("Salerno") and Bill Adams ("Adams"), the school district Superintendent and Human Resources Administrator, respectively.

The following month, plaintiff and a union representative met with Salerno, Adams, Pristera, and a school district attorney to discuss the issue further. Salerno claimed ignorance of any orders denying plaintiff access to the 19–A office and files, and said he would investigate the matter. When asked by a union representative why he had claimed the orders came from Salerno, Pristera remained silent. By letter dated one day later, Salerno granted plaintiff access to the 19–A office and files, and informed him he would be under the supervision of Roennpagel. Plaintiff alleges Pristera and Roennpagel nonetheless continued to deny him access to the office and files.

In December of 1997, plaintiff alleges that Pristera and others conspired to convince another employee to file a sexual harassment charge against him. Plaintiff claims Pristera and Roennpagel summoned one of plaintiff's trainees, Louise Kosakowski ("Kosakowski"), to the transportation office to discuss plaintiff's job performance. Plaintiff claims Kosakowski told him of the meeting, that she offered a positive appraisal of his job performance,

and that it was her belief that "it was obvious they just wanted to dig something up on you." (Amended Complaint, ¶ 26). That same month, Adams met with two school district bus aides, informing them that a sexual harassment complaint would be lodged against plaintiff. According to plaintiff, both women responded in the negative when asked if plaintiff had sexually harassed them. On December 24, 1997, Kosakowski filed a sexual harassment complaint against plaintiff.

On January 5, 1998, "plaintiff stated to defendant Pristera that if he was not permitted to perform the duties of 19–A trainer [by being granted access to the 19–A office and files] then he should resign from the position." (Amended Complaint, ¶ 29). The next day, plaintiff claims Pristera told him that if he wanted to resign, he would need to submit a written resignation to Adams. The next day, January 7, 1998, plaintiff informed Pristera he would not resign his 19–A position. Pristera allegedly responded by telling plaintiff the situation would need to be discussed with Adams.

On January 14, 1998, plaintiff met with a union lawyer to discuss Pristera's conduct. According to plaintiff, the union lawyer told him that the Pristera's behavior had been reported to the school district on a number of occasions, but that no action had been taken. Plaintiff claims the lawyer suggested he talk with his co-employees to ascertain their willingness to file complaints against Pristera, which plaintiff did.

On February 2, 1998, Adams informed plaintiff the school district had accepted his "verbal resignation" from the 19–A position in lieu of terminating him from the same. (Amended Complaint, ¶ 32). Plain-

tiff retained his Bus Driver position. Two days later, plaintiff filed a Notice of Claim with the school district.

On February 9, 1998, plaintiff was interviewed by Adams regarding Kosakowski's sexual harassment complaint. Plaintiff claims Adams told him the complaint was based on plaintiff complimenting Kosakowski on her weight loss, and telling her that his marriage and home life was troubled. Plaintiff denied the allegations, informed Adams he had never been alone with Kosakowski, that she had recently given him gifts for his home and for his niece, and that, if anything, Kosakowski had made sexually offensive remarks in the workplace. Some time later, plaintiff was informed that the investigation was "inconclusive." (Amended Complaint, ¶ 35).

On February 18, 1998, two weeks after the Notice of Claim was filed, another complaint was filed against plaintiff, this time by one of the alleged conspirators, Roennpagel. The complaint alleged "harassment, sexual harassment, slander and defamation of character." (Amended Complaint, ¶ 36). Investigation into this complaint also resulted in an inconclusive finding.

A week later, plaintiff was interviewed by several administrators, including Adams, regarding his complaint about Pristera's workplace conduct. Though plaintiff informed his interviewers that the conduct had worsened since the complaint, the school district later determined plaintiff's complaint to be "unfounded." (Amended Complaint, ¶ 38).

Almost four months later, on June 11, 1998,[3] a union attorney filed an administra-

---

**3.** The June 11, 1998, date is one asserted by plaintiff in his Amended Complaint, ¶ 3(a), and by the school district in its moving papers, Docket No. 27. Plaintiff also claims, however, in another part of his Amended Complaint, and in his moving papers, that he filed the charge on June 16, 1998. *See* Amended Complaint, ¶ 39; Docket Nos. 30,

tive charge of discrimination with the New York State Division of Human Rights ("DHR") on plaintiff's behalf. The charge alleges Pristera and the school district engaged in "an unlawful discriminatory practice... because of Opposing Discrimination." (Docket No. 26, Exhibit B). The charge details Pristera's allegedly improper workplace comments, union complaints about such behavior, plaintiff's January 14, 1998, meeting with a union attorney and the advice given therein, the denial of access to the 19–A office and files, his termination from that position, the filing of his Notice of Claim, an allegation that Pristera conspired with others to falsely accuse him of sexual harassment, and a plea to consolidate his complaint with those of others that have or will file similar charges.[4] Just over a week later, plaintiff received a negative performance evaluation from Pristera.

A few months later, on September 10, 1998, plaintiff received a disciplinary notice from Pristera for failing to report to work for an early school dismissal. A union official challenged this as erroneous, saying it was clearly a scheduling error on the school district's part, but Adams refused to remove the notice from plaintiff's file.

In November of 1998, Kosakowski allegedly told plaintiff that her filing a sexual harassment charge against him "was all [Pristera's] idea," and that she was sorry. (Amended Complaint, ¶ 42). After being asked to put said apology in writing, Kosakowski hesitated, telling plaintiff that Pristera and Roennpagel had pressured her to file the complaint, and that they told her the investigation would be "informal."

(Amended Complaint, ¶ 43). She then allegedly admitted to plaintiff, in front of another employee, that her complaint was false, and that school district officials had told her plaintiff was having difficulties with his marriage and home life. Plaintiff told Kosakowski that Adams had told him that she claimed he had such difficulties. The next day, in a meeting with plaintiff and a union representative, Kosakowski claimed Pristera had summoned her into his office after hearing about her admissions and apology made the previous day. Kosakowski informed plaintiff she remained afraid of giving a written apology to plaintiff.

A few months later, in February of 1999, plaintiff and some union representatives and officials met with Salerno, Sagendorf, and Kosakowski concerning the alleged admissions made by Kosakowski. During the meeting, Kosakowski reiterated her belief that the complaint would be handled informally, and allegedly expressed words manifesting surprise that the complaint was treated as a sexual harassment charge. After a union official asked her if that is what she thought it was when she signed the complaint, Salerno interrupted and took Kosakowski out of the room. Upon returning, Kosakowski told plaintiff that he did harass her.

The next month, on March 18, 1999, Sagendorf issued plaintiff a disciplinary notice, ordering him to park his vehicle only in an assigned parking space. Less than a week later, plaintiff claims he found a vehicle parked in his space, causing him to park elsewhere. Later that afternoon,

39. Because the charge is time-stamped as received by DHR on June 12, 1998, the June 11 date will be used for purposes of this motion. *See* Docket No. 26, Exhibit B.

4. The school district claims that the administrative complaint alleges that "the retaliation

began after January, 1998." *See* Docket No. 27, p. 10. According to the cover page of such complaint, however, "01/14/98" is merely the "[d]ate most recent or continuing discrimination took place." *See* Docket No. 26, Exhibit B.

Adams handed plaintiff an envelope containing a letter from Salerno. The letter criticized plaintiff for ignoring Sagendorf's orders, threatened to tow and impound plaintiff's car, and threatened to charge plaintiff with insubordination. Plaintiff got upset and threw away what he thought was just the envelope. When he discovered the letter had been thrown away as well, he attempted to retrieve it, but Adams allegedly would not permit such retrieval, threatening plaintiff with insubordination charges. After this, plaintiff went home after telling a dispatcher he was too upset to drive his afternoon shift. He later received a disciplinary notice from Pristera for failing to cover the shift.

The next day, March 25, 1999, a school district bus driver parked in a spot not assigned to him after finding someone had taken his assigned spot. Plaintiff claims that this driver was questioned but not disciplined, and that the driver was told over the radio that parking in another spot is permissible if his own spot was taken.

On June 17, 1999,[5] a union attorney filed a second charge of discrimination with DHR. Because the investigation of plaintiff's first charge was not complete, or perhaps even started, this second charge was consolidated with the first charge. The charge alleges Pristera and the school district engaged in "an unlawful discriminatory practice relating to sex and retaliation." (Docket No. 26, Exhibit C). The charge was filed for the "direct retaliation" plaintiff incurred as a result of voicing his complaint against Pristera and for filing the first administrative charge. (Id.). The charge goes into more detail about the alleged conspiracy and results of the inves-

tigation of Kosakowski's complaint, including her apology to plaintiff and the school district's refusal to remove such complaint from plaintiff's permanent file. It also alleges that "since the filing of [the first administrative complaint], ... Pristera has engaged in a campaign of retaliation against [plaintiff]." (Id.).

Two months later, in September of 1999, plaintiff used accrued leave time, but was required to submit a note from the nursing home where he was going. Plaintiff claims no other employees were required to submit such a note. In that same month, Pristera allegedly told the school district Assistant Superintendent, Leo Guelpa, that plaintiff, while in his 19–A position, had taken Kosakowski to his home to engage in sexual relations. This allegation was false. Later that same month, on September 24, 1999, Pristera was suspended by the school district as a result of his being arrested and criminally charged with larceny, scheming to defraud, and falsifying business records, all such charges stemming from his position with the school district. Pristera was terminated the following month, but plaintiff claims the harassment and retaliation continued.

In January of the following year, Sagendorf, apparently in response to plaintiff complaining of the continued harassment and retaliation, told plaintiff "words to the effect[,] '[y]ou have no complaints with me, [Pristera's] gone." (Amended Complaint, ¶ 56). Plaintiff claims he told Sagendorf that she was a school district representative and that the harassment and retaliation had to stop.

A few months later, in April of 2000, plaintiff told Sagendorf, now the Transpor-

---

5. A copy of the charge itself reveals the charge was signed by plaintiff on June 17, 1999, and both the school district and plaintiff himself mention the same date. *See* Docket No. 26, Exhibit C; Amended Complaint,

¶ 3(a); Docket No. 27. Plaintiff, however, in both his moving papers and elsewhere in his pleading, mentions the date of this second charge as July 2, 1999. *See* Amended Complaint, ¶ 51; Docket Nos. 30, 39.

tation Supervisor, that he was unable to complete his assigned bus driving route in the time allotted. After giving the reasons for such inability, Sagendorf refused to adjust his route time, despite allegedly doing so readily for other drivers. Five months later, plaintiff again complained to Sagendorf of his inability to complete his route in the allotted time. Allegedly, despite adjusting other drivers' route times, she again refused plaintiff's request, and, in fact, a wheelchair-bound student was even added to plaintiff's route. Three months later, in November of 2000, a school district dispatcher under Sagendorf's control allegedly refused to add plaintiff to the "extra work list," which gave drivers additional routes.

During March and April of 2001, plaintiff claims school district employees contacted administration officials and parents of children riding on plaintiff's bus, asking them when plaintiff was arriving and departing, whether anyone wished to complain about plaintiff's performance, and informing them that plaintiff was often late returning from his route. Plaintiff is unaware of any reported problems.

In June of 2001, the school district filed charges against plaintiff under Civil Service Law, seeking his termination for insubordination and excessive absenteeism. On October 22, 2001, plaintiff was suspended without pay and his health benefits, without his knowledge, were terminated. The following day, DHR dismissed plaintiff's administrative complaints for lack of probable cause. Plaintiff sought review of this determination from the Equal Employment Opportunity Commission ("EEOC").

He was then terminated from his position as bus driver at a school board meeting on November 13, 2001. After being notified that it illegally went about terminating plaintiff's health benefits and em-

ployment, the school district returned plaintiff to its payroll for twelve days in December of 2001, then terminated him again.

By letter dated February 6, 2002, the EEOC issued plaintiff a Notice of Right to Sue. The instant action was commenced two weeks later, on February 19, 2002.

## III. DISCUSSION

### A. 12(b)(6) Motion To Dismiss Standard

In deciding a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), a court "must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir.1994) (internal quotation and citation omitted). However, conclusory allegations that merely state the general legal conclusions necessary to prevail on the merits and are unsupported by factual averments will not be accepted as true. See, e.g., Clapp v. Greene, 743 F.Supp. 273, 276 (S.D.N.Y.1990); Albert v. Carovano, 851 F.2d 561, 572 (2d Cir.1988).

### B. § 1983 Claims

#### 1. Statute of Limitations

The school district and Pristera have moved to dismiss plaintiff's second and fifth causes of action, respectively, both of which allege violation of 42 U.S.C. § 1983, on the ground that such claims are barred by the statute of limitations.

■ Congress did not statutorily create a limitations period for actions brought in federal court under 42 U.S.C. § 1983, "a void which is commonplace in federal stat-

utory law." *Bd. of Regents of Univ. of State of New York v. Tomanio,* 446 U.S. 478, 483, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980). As a result, the Supreme Court held, first, that the statute of limitations for such actions is borrowed from state law, *Id.; Singleton v. City of New York,* 632 F.2d 185, 189 (2d Cir.1980), and then, after confusion emerged in the lower courts regarding which state limitations period to "borrow," that claims brought under § 1983 are governed by the limitations period for personal injury suits under the laws of state where the cause of action arose. *See Lounsbury v. Jeffries,* 25 F.3d 131, 133 (2d Cir.1994) (citing *Wilson v. Garcia,* 471 U.S. 261, 280, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985)). In New York, the statute of limitations for personal injury actions, and thus claims under § 1983, is three years. N.Y. C.P.L.R. § 214(5); *Owens v. Okure,* 488 U.S. 235, 237–39, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989); *Veal v. Geraci,* 23 F.3d 722, 724 (2d Cir.1994).

### a. "Accrual"

However, when that statute of limitations begins to run, i.e., when the cause of action "accrues," is governed by federal law. *Jaghory v. New York State Dep't. of Educ.,* 131 F.3d 326, 331 (2d Cir.1997). Under federal law, the accrual date for a § 1983 claim is when "the plaintiff knows or has reason to know of the injury which is the basis of his action." *Pinaud v. Cty. of Suffolk,* 52 F.3d 1139, 1156 (2d Cir.1995). Though "[t]he proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful[,]" *Chardon v. Fernandez,* 454 U.S. 6, 8, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (citing *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)), the Second Circuit in *Pinaud* recognized that, when a municipality is a defendant based on its policy or custom, as plaintiff alleges

here, a § 1983 action "does not necessarily accrue upon the occurrence of a harmful act, but only later when it is clear, or should be clear, that the harmful act is the consequence of a county 'policy or custom'." 52 F.3d at 1157. Indeed, " '[w]here no single act is sufficiently decisive to enable a person to realize that he has suffered a compensable injury, the cause of action may not accrue until the wrong becomes apparent'." *Id.* (quoting *Singleton,* 632 F.2d at 191–92). This delayed accrual rule applies with equal force to individual defendants sued in their official capacities. *See, e.g., DeVito v. Incorporated Village of Valley Stream,* 991 F.Supp. 137, 139 n. 1 (E.D.N.Y.1998) (citations omitted).

Plaintiff knew of the retaliatory nature of Pristera's conduct in October of 1997. That month, Pristera responded to a union representative's queries about denying plaintiff access to the 19–A office and files by telling him that plaintiff filed a harassment charge against him. Despite alleging he was not aware of the retaliatory nature of Pristera's conduct until much later, this statement to the union representative would be sufficient to put plaintiff on notice of a possible retaliation action against Pristera. Thus, plaintiff's cause of action against Pristera accrued in October of 1997.

As to the school district, the accrual date is later. To become reasonably aware of the alleged retaliatory pattern or practice of the school district, certain things must first occur, namely, the failure to remedy the Pristera situation or engagement in acts by other school district officials that would put plaintiff on notice a persistent, widespread policy. He alleges many facts in 1997 that would arguably put him on notice, such as conspiratorial actions between Pristera and Roennpagel and Adams' meeting with the

school district bus aides, but he does not allege he became aware of such conduct at the time. It is arguable that plaintiff became aware of the alleged retaliatory policy in February of 1998, when Adams accepted his "verbal resignation" from the 19–A position. At this point, however, one administrator's actions is not likely to make plaintiff realize such an allegedly complex retaliatory web is aimed at him. One may be most inclined to determine the accrual date is in February of 1999, when Kosakowski allegedly admitted to the conspiracy. However, in plaintiff's first administrative charge, filed on June 16, 1998, he named both the school district and Pristera as engaging in a discriminatory pattern of retaliation. Thus, he must have been aware of his cause of action prior to that date.

Unfortunately for plaintiff, even these delayed accrual determinations do not allow his 1997 and 1998 allegations to be considered under his § 1983 claim. Under the three-year statute of limitations applicable to § 1983 actions, his complaint covers only conduct dating back three years, to February 19, 1999, even if his cause of action accrued prior to this date. Thus, any conduct occurring prior to February 19, 1999, is time-barred unless the prior acts can be considered through invocation of a tolling doctrine, *infra*.

### b. Traditional Tolling Doctrines

■ Because "[i]n virtually all statutes of limitations the chronological length of the limitation period is interrelated with provisions regarding tolling, ...," federal courts are also instructed to borrow state tolling doctrines when faced with § 1983 claims, but only so long as the application of such doctrines is consistent with federal law or policy. *Hardin v. Straub*, 490 U.S. 536, 538–39, 109 S.Ct. 1998, 104 L.Ed.2d 582 (1989); *Occidental Life Ins. Co. v.*

*EEOC*, 432 U.S. 355, 367, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977). New York has legislatively identified four situations in which a limitations period may be tolled, *Leon v. Murphy*, 988 F.2d 303, 310 (2d Cir.1993) (citing N.Y. C.P.L.R. §§ 204(a), 204(b), 207, 208), none of which apply to the instant case.

Limitations periods are also subject to equitable tolling and equitable estoppel, both of which if satisfied can save a plaintiff's otherwise time-barred § 1983 claim, unless applying either doctrine would be inconsistent with the text or policies underlying 42 U.S.C. § 1983. *See Young v. United States*, 535 U.S. 43, 122 S.Ct. 1036, 1040, 152 L.Ed.2d 79 (2002) (equitable tolling); *Leon*, 988 F.2d at 310 (equitable estoppel); *see also Dillman v. Combustion Engineering, Inc.*, 784 F.2d 57, 61 (2d Cir.1986) (recognizing distinction between tolling and estoppel). These doctrines, when applicable, usually place the blame for untimely filings on the defendants. *See Redlich v. Albany Law School of Union Univ.*, 899 F.Supp. 100, 104 (N.D.N.Y. 1995). In their most traditional sense, neither of these doctrines apply to the instant case, as plaintiff claims neither that reliance on false statements of the defendants delayed bringing an action he knew he had, *Buttry v. General Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir.1995) (estoppel primarily applies where plaintiff knows of cause of action but does not bring suit because of reliance on defendant's misrepresentations or conduct), nor that he was ignorant of his cause of action due to some type of fraudulent concealment by the defendants. *See Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 48 (2d Cir.1985) (equitable tolling primarily applies where defendants' conduct resulted in plaintiff's ignorance of his cause of action).

Because tolling principles are supposedly grounded in the goal of avoiding inequitable circumstances in general, *Johnson,* 86 F.3d at 12, and are supposedly invoked "as a matter of fairness," *Cerbone,* 768 F.2d at 49, one may be inclined to toll the statute of limitations for a § 1983 action while other claims arising out of identical facts, such as Title VII claims, are pending at the administrative level. This inclination may seem especially appropriate in light of the fact that administrative agencies are notorious for the length of time they take to adjudicate claims. *See Johnson v. Railway Express Agency,* 421 U.S. 454, 465 n. 11, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) ("We are not unmindful of the significant delays that have attended administrative proceedings in the EEOC"). Nonetheless, courts in the Second Circuit routinely reject the argument that initiating a state or federal administrative proceeding will toll the statute of limitations for a § 1983 claim. *See, e.g., Szarejko v. Great Neck School District,* 795 F.Supp. 81, 83 (E.D.N.Y.1992) ("[T]he law is clear that the pursuit of Title VII administrative remedies does not toll the statute of limitations on other Civil Rights Act claims"). Perhaps at odds with the practical realities of the administrative process and the goal of keeping litigation costs down, the Second Circuit has indicated that the proper way for plaintiffs to proceed in such a scenario is to file suit on the § 1983 claim, and then later amend the complaint after the outcome of the administrative proceedings. *See Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 576 (2d Cir.1989).

The rationale behind not tolling the § 1983 limitations period during the pendency of administrative adjudication of claims arising out of the same facts or incidents is typically borrowed from *Johnson,* in which the Supreme Court refused to toll the statute of limitations for a § 1981 claim during administrative proceedings. 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295. The Court, outlining the argument in a way that facially appeared to favor plaintiffs, noted that the legislative history of Title VII indicated Congress' intent that individuals be permitted to pursue rights independently under Title VII and the Civil Rights Act of 1866. *Id.* at 459, 95 S.Ct. 1716. Further, explained the Court, "the filing of a Title VII charge and resort to Title VII's administrative machinery are not prerequisites for the institution of a § 1981 action." *Id.* at 460–61, 95 S.Ct. 1716. (citations omitted).[6] It

---

**6.** For many years, the Second Circuit, distinguishing broad Supreme Court holdings like the one in *Johnson,* steadfastly required § 1983 plaintiffs to first exhaust administrative remedies before filing suit in federal court, unless resort to the administrative process would be futile or "where the question of the adequacy of the administrative remedy is for all practical purposes coextensive with the merits of the plaintiff's constitutional claim." *See Fuentes v. Roher,* 519 F.2d 379, 386–87 (2d Cir.1975); *Eisen v. Eastman,* 421 F.2d 560, 569 (2d Cir.1969) (reading *McNeese v. Bd. of Educ.,* 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), as "simply condemning a wooden application of the exhaustion doctrine"). Such a rule, according to Justice Powell, in *Patsy v. Bd. of Regents of State of*

*Florida,* 457 U.S. 496, 532–33, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (POWELL, dissenting), "rests on sound considerations":

It does not defeat federal court jurisdiction, it merely defers it. It permits the State to correct violations through their own procedures, and it encourages the establishment of such procedures. It is consistent with the principles of comity that apply whenever federal courts are asked to review state action or supersede state proceedings. Moreover, and highly relevant to the effective functioning of the overburdened federal court system, the rule conserves and supplements scarce judicial resources.

The majority in *Patsy,* however, held very broadly that exhaustion of administrative remedies is not required in a § 1983 action.

was admitted that the administrative process serves the function of dispute resolution without the pains of litigation, and that litigation would often serve to deter settlement efforts, but these concerns were explained away as "the natural effects of the choice Congress has made available to the claimant by its conferring upon him independent administrative and judicial remedies." *Id.* at 462, 95 S.Ct. 1716. The Court expressed hesitancy at interfering with that "choice." *Id.* In response to the notion that failure to toll the statute of limitations for a § 1981 claim may "press" a plaintiff into court prior to the completion of the administrative proceedings, the Court offered that such a plaintiff "may ask the court to stay proceedings until the administrative efforts at conciliation and voluntary compliance have been completed." *Id.* at 465, 95 S.Ct. 1716. More "fundamental[ly]," noted the Court, nothing stops a § 1981 plaintiff from filing suit at any time after his or her cause of action accrues, since the initiation of administrative processes is not a prerequisite to such an action. *Id.* at 467, 95 S.Ct. 1716.[7]

Thus, because tolling is not available during the pendency of administrative proceedings on other claims, plaintiffs have been left "holding the bag" despite timely filed administrative complaints arising out of the exact same facts as any § 1983 claims and amazingly dilatory conduct on the part of administrative bodies. *See, e.g., Black v. Broward Employment and Training Admin.*, 846 F.2d 1311, 1312 (11th Cir.1988) (no tolling where administrative decision issued nearly seven years after administrative complaint filed); *Tuckett v. Police Dep't. of City of New York*, 708 F.Supp. 77, 78 (S.D.N.Y.1989) (no tolling where administrative decision issued almost seven and a half years after administrative complaint filed). Indeed, it appears that in these cases, and quite possibly the instant one, it is the administrative bodies, rather than the plaintiffs themselves, which are sleeping on the plaintiffs' rights. Therefore, though sympathy and frustration are most certainly expressed

457 U.S. at 516, 102 S.Ct. 2557. Despite its long line of holdings reaffirming the exhaustion requirement, the Second Circuit thereafter pronounced that "[i]t has *long been settled*" that such exhaustion was not mandatory. *Patterson v. Coughlin*, 761 F.2d 886, 891 (2d Cir.1985) (emphasis added). Other federal courts in the Second Circuit, now apparently unwilling to distinguish broad holdings like the one in *Patsy*, followed suit without comment. *See, e.g., Ward v. Thomas*, 207 F.3d 114, 130 (2d Cir. 2000); *Jones v. New York State Div. of Military and Naval Affairs*, 166 F.3d 45, 54 (2d Cir.1999); *Doe v. Pfrommer*, 148 F.3d 73, 78 (2d Cir.1998); *Wilbur v. Harris*, 53 F.3d 542, 544 (2d Cir.1995); *Franzon v. Massena Memorial Hosp.*, 977 F.Supp. 160, 165 (N.D.N.Y.1997). With reluctance and resignation, this precedent must be followed.

7. Identical reasoning has been employed where an administrative complaint has necessarily been filed and the claim time-barred at the time a complaint is filed is a federal claim, *see Higgins v. New York Stock Exchange, Inc.*, 942 F.2d 829, 833–34 (2d Cir. 1991), or a state claim. *See, e.g., Duran v. Jamaica Hosp.*, 216 F.Supp.2d 63, 68 (E.D.N.Y.2002) (collecting cases); *but see Forbes v. Merrill Lynch, Fenner & Smith, Inc.*, 957 F.Supp. 450, 455 (S.D.N.Y.1997) (statute of limitations tolled for intentional infliction of emotional distress claim until such time as EEOC issues right-to-sue letter). The Second Circuit has also routinely refused to toll the statute of limitations for § 1983 claims during the pendency of state judicial proceedings, *see Williams v. Walsh*, 558 F.2d 667, 675 (2d Cir.1977) (refusing to toll statute of limitations for § 1983 claim where plaintiff filed suit first in state court and had federal claims addressed in that forum); *Meyer v. Frank*, 550 F.2d 726 (2d Cir.1977) (plaintiff's initiation of Article 78 proceeding to set aside his removal did not toll statute of limitations for § 1983 claim), unless such state proceeding was criminal. *See Howard v. Koch*, 575 F.Supp. 1299, 1304–05 (E.D.N.Y.1982).

for plaintiff's predicament, traditional equitable tolling doctrines are nonetheless of no aid in permitting consideration of defendants' alleged conduct prior to February 19, 1999.

#### c. Continuing Violations

■ Plaintiff is permitted refuge, however, in the continuing violations doctrine. If satisfied, this doctrine allows a plaintiff "to bring suit challenging all conduct that was a part of [a continuing violation], even conduct that occurred outside the limitations period." *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir.1994); *see also Annis v. County of Westchester*, 136 F.3d 239, 246 (2d Cir.1998). Though the doctrine is not looked kindly upon in the Second Circuit, *Findlay v. Reynolds Metals Co., Inc.*, 82 F.Supp.2d 27, 37 (N.D.N.Y.2000), it may be invoked upon the demonstration of one of two showings: 1) specific ongoing discriminatory policies; or 2) specific and related instances of discrimination that the employer permits to continue for such a time that the instances amount to a discriminatory policy or practice. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir.1998). Thus, the "continuing violation exception is usually associated with a discriminatory policy, rather than with individual instances of discrimination," *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir.2001), and "multiple incidents of discrimination, even similar ones, that are not a result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir.1993); *see also Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir.1997).

A recent Supreme Court decision, *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), reinforced these principles and further curtailed the use of the continuing violations doctrine. The Court in *Morgan* noted that Title VII requires a plaintiff to file an administrative complaint within 180 or 300 days after an "unlawful employment practice," or else not recover, but clarified that "[t]here is simply no indication that the term 'practice' converts related discrete acts into a single unlawful practice for the purposes of timely filing." *Id.* at 2071. Thus, a "practice" may be "a discrete act or single 'occurrence' even when it has a connection to other acts," and "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 2071–72. Therefore, each discrete discriminatory or retaliatory act is independently actionable, requiring an independent and timely filed charge, and all discrete acts for which there has been no independent and timely filed charge "are not actionable . . ., even when they are related to acts alleged in timely filed charges." *Id.* at 2072.

Highly relevant to this case, however, the Court in *Morgan* expressly noted that it's opinion was not addressed to "pattern-or-practice" claims. *Id.* at 2073 n. 9 ("We have no occasion here to consider the timely filing question with respect to 'pattern-or-practice' claims brought by private litigants as none are at issue here"). Defendants urge the application of *Morgan*. Because *Morgan* dealt with Title VII, defendants are implicitly arguing that the continuing violations principles enunciated by the Court are applicable to a corollary of Title VII—in this case, § 1983. A corollary to a Title VII "pattern or practice" claim is a § 1983 "policy or custom" claim. Therefore, for purposes of applying *Morgan* to the instant case, any of plaintiff's § 1983 allegations referring to a "policy or custom" are analogous to Title VII allegations referring to a "pattern or practice," are not controlled by the *Morgan* holding, and can form the basis of a continuing violation.

■ It is conceded that if plaintiff was seeking recovery for each independent and separate instance of alleged retaliation, as is urged by defendants, then *Morgan* would control and plaintiff, to the extent that he seeks relief based on conduct prior to February 19, 2002, would have no recourse.[8] This, however, is not the case. Plaintiff instead repeatedly expresses or implicates, in the Amended Complaint[9] and elsewhere,[10] that the actions of defendants upon which his suit is based constitute a "policy" or "custom." As such, the Amended Complaint alleges facts that, if believed by the jury, form a permissible and appropriate basis for invocation of the continuing violations doctrine, and those actions of defendants occurring prior to February 19, 1999, that are part of the continuing violation can be considered in plaintiff's § 1983 claims.[11]

This is not to say that all conduct prior to February 19, 1999, is part of the continuing violation, or even that there was a continuing violation. Whether a continuing violation existed, and which pre- and post-February 19, 1999, acts are a part thereof, i.e., whether the acts satisfy the legal principles outlined above, such as whether such conduct was sufficiently similar or related in both time and substance to the same "policy," is a jury determination. It is held here only that the availability of the doctrine, as a matter of law,

8. Emphasis is placed on the phrase "based on." As is discussed below, *infra* note 11, even if *Morgan* does apply, the pre-February 19, 1999, acts could be considered as "background" for any timely claims.

9. *See, e.g.,* Amended Complaint, ¶ 20 ("Pristera began a persistent campaign of harassing and retaliatory behavior against plaintiff"); ¶ 72 ("Defendant's [school district's] retaliatory conduct was persistent and widespread, and constitues a municipal policy or custom"); ¶ 82 ("Defendant Pristera was acting under color of state law, whose discriminatory and retaliatory practices were persistent and widespread").

10. Though occasionally off the mark in legal analysis, plaintiff's moving papers make repeated reference to the alleged retaliatory policy or custom. *See, e.g.,* Docket No. 30, pp. 3, 18 and Docket No. 39, pp. 3 and 18 ("... persistent campaign of harassing and retaliatory behavior..."); Docket No. 30, p. 6 and Docket No. 39, p. 5 ("... unrelenting harassing and retaliatory workplace conduct"); Docket No. 30, p. 17 ("... policy or practice by defendants... "); Docket No. 39, p. 15 ("... defendant's 'custom' and 'policy' of retaliatory conduct"); Docket No. 39, p. 17 ("... relentless campaign of abuse... "). Though plaintiff need only allege a "policy" or "custom" in his Amended Complaint for his § 1983 claim to be sufficiently plead, language in his administrative charges also support such an allegation. *See, e.g.,* Docket No. 26, Exhibit C, ¶ 11 ("That since the lodging of the [first] Human Rights complaint against the [defendants], that Mr. Pristera has engaged in a campaign of retaliation against [plaintiff]"); Docket No. 26, Exhibit B, ¶ 7 (" ... continuing problem in the bus garage... "), 22 ("That this problem has been going on in the Guilderland bus garage for many years").

11. Even if the allegations comprising plaintiff's § 1983 claims could somehow be construed as not advancing a pattern- or practice-like theory, and are separate and discrete acts of retaliation that do not have the benefit of the continuing violations doctrine, the acts occurring prior to February 19, 1999, could still be used as a "background evidence in support of a timely claim." *Morgan,* 122 S.Ct. at 2072. Plaintiff alleges that the acts after February 19, 1999, merely flowed from the alleged policy of retaliation begun by Pristera. While it is arguable that the acts alleged by plaintiff are disconnected and were taken on a lawful basis, plaintiff has also presented sufficient facts for a jury to conclude that the acts were connected and there was a widespread policy in place to retaliate against plaintiff. Thus, even if a pattern and practice of retaliation was not alleged, and *Morgan* did control, the prior acts, placing the post February 19, 1999, acts in proper context, create a factual issue as to whether the alleged conspiracy of retaliation occurred, and dismissal would be inappropriate.

is not foreclosed by *Morgan* or when analyzed in the context of the Amended Complaint. Plaintiff will still need to sufficiently prove its applicability at trial.

### 2. *Substantive Merits*

Pristera has also moved for summary judgment on plaintiff's *fifth* cause of action against him on the grounds that there was no actionable retaliatory conduct between February 19, 1999, and February 19, 2002, and even if there was, he was not personally involved in it.[12] Because the continuing violations doctrine has potential applicability in this case, and because Pristera certainly was personally involved in conduct that could be found by a jury to be part of an unlawful policy of retaliation, both before and after February 19, 2002, his motion to dismiss is denied.

### a. *Actionable Retaliation—"Adverse Employment Action"*

■ Pristera alleges that no actionable retaliation occurred between February 19, 1999, and February 19, 2002. As noted, because of the potential applicability of the continuing violation doctrine, considering such a time period at this juncture is inappropriate. Therefore, Pristera's motion must be analyzed in the context of all the alleged conduct. Plaintiff's *fifth* cause of action, as against Pristera, alleges retaliation for plaintiff's exercise of First Amendment rights. To succeed on such a claim, plaintiff is required to prove: 1) that his speech was constitutionally protected; 2) that he suffered an "adverse employment action"; and 3) that his speech was a motivating factor in the adverse employment action taken against him. *See Phil-*

*lips v. Bowen,* 278 F.3d 103, 109 (2d Cir. 2002). Pristera argues that the second element—the existence of an adverse employment action—has not been proven in this case. The Second Circuit has recently had occasion to consider this element in detail:

> Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand. We have also held that lesser actions may meet the adversity threshhold, but we have not explicitly defined what quantum of lesser actions constitutes an adverse employment action.
>
> We are extremely mindful that a merely discourteous working environment does not rise to the level of First Amendment retaliation... [However,] [o]ur precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach critical mass.
>
> Thus, we hold that in order to prove a claim of First Amendment retaliation in a situation other than the classic examples of discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand, plaintiff must show that (1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace.

*Id.* (internal quotations and citations omitted).

■ In the instant case, plaintiff has alleged that defendants' retaliatory policy culminated in plaintiff's termination, not

---

12. The school district moves to dismiss plaintiff's § 1983 claim only on the ground that actions prior to February 19, 1999, cannot be considered. It makes mention neither of the substantive merits of those claims, nor of the alleged conduct after that date. Thus, the school district's motion is more appropriately classified as a partial motion to dismiss, and it is denied.

once but twice. The first time he was terminated, from the 19–A position, he retained his Bus Driver position, but his total pay was necessarily reduced. The second time he was terminated, his employment ended with the school district altogether. These two employment decisions, as asserted in the Amended Complaint, are "classic examples" of adverse employment actions.

Further, under the non-classic example standard handed down by the Second Circuit in *Phillips*, other actions taken by defendants, alleged in the Amended Complaint, could constitute adverse employment actions. Taking the facts as alleged by plaintiff as true, one would be hard pressed to argue that conspiring to have two employees file a sexual harassment charge against plaintiff and the subsequent attempted "damage control" or, more bluntly, "cover-up" of such conspiracy by various school district officials, denying plaintiff the access to materials needed to do his job, the issuance of unwarranted negative job evaluations and disciplinary notices, the addition of a wheelchair-bound student to plaintiff's route with the full knowledge that time was already a problem in completing said route, the implanting of a false charge against plaintiff in the mind of a high-ranking school district official, and the filing of unwarranted Civil Service charges against plaintiff that resulted in his suspension and unlawful termination of his health benefits, were not acts that changed plaintiff's workplace environment to one that is "unreasonably inferior" to that of a normal environment. Again, taking the allegations as stated by plaintiff as true, notwithstanding that plaintiff is alleging more of a retaliatory policy, as opposed to single incidents of actionable retaliation, a jury could most certainly find these employment actions to be adverse.

#### b. *Personal Involvement*

 Pristera also correctly points out that personal involvement is a prerequisite to his liability under § 1983. Docket No. 30, p. 4 (citations omitted); *see also Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir.2001). One way to demonstrate personal involvement is to show that the supervisor defendant directly participated in the constitutional violation alleged. *Id.* As was the case under the previous subpart, *supra*, all of defendants' acts contributing to the retaliatory policy are considered, even those prior to February 19, 1999. As such, it is clear Pristera directly participated in the continued denial of access to the 19–A files and office, directly participated in convincing Kosakowski to file a false sexual harassment charge against plaintiff, directly participated in enlisting the aid of others in a conspiracy to so convince Kosakowski, directly participated in issuing plaintiff unwarranted disciplinary notices, and directly participated in falsely telling a high-ranking school district official that plaintiff initiated and engaged in sexual relations with one of his trainees.

To the extent that Pristera argues for partial dismissal of those acts in which he did not directly participate, said argument is also rejected. Pristera spearheaded the conspiracy and policy of retaliation towards plaintiff. It would flaunt notions of justice to allow him to escape liability for actions which had a basis in and were informed by his own actions. The actions subsequent to his termination—the refusal to add time to plaintiff's route, the contacting of parents to open the door to complaints about plaintiff, the filing of the Civil Service charges, and plaintiff's ultimate suspension and termination—all sprung from Pristera's commencement of the retaliatory policy. The evidence seems to indicate that Sagendorf, who refused to

add time to plaintiff's route despite doing so for others, worked closely with Pristera. Contacting the parents of children who rode on plaintiff's route could be seen as searching for a reason to fire plaintiff, such search being initiated by Pristera's conduct. Finally; it could be found that the suspension and termination are merely the end-products of the alleged conspiracy and policy of retaliation against plaintiff. Pristera cannot allegedly start such a chain of events, and then attempt to immunize himself from liability by pointing the finger elsewhere. Pristera's motion to dismiss is therefore denied.

### C. *Title VII—Reasonably Related Claims*

■ The school district has moved for summary judgment on plaintiff's *first* cause of action, which alleges violation of Title VII's anti-retaliation provision, on the ground that plaintiff failed to allege many claims in his administrative complaints that he now asserts here.

Unlike § 1983 claims, *supra* note 6, "[e]xhaustion of administrative remedies through the EEOC is 'an essential element' of the Title VII ... statutory scheme[ ] and, as such, a precondition [13] to bringing such claims in federal court." *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,* 274 F.3d 683, 686 (2d Cir.2001) (quoting *Francis v. City of New York,* 235 F.3d 763, 768 (2d Cir.2000)). Thus, Title VII is said to have an "exhaustion requirement," and claims not raised in an administrative complaint will generally not be heard in federal court. *See Shah v. New York State Dep't. of Civil Service,* 168 F.3d 610, 613 (2d Cir.1999). An exception to the exhaustion requirement applies, however, where the claims now asserted in federal court are "reasonably related" to those asserted in the administrative complaint.[14] *Legnani,* 274 F.3d at 686.

"The Second Circuit has recognized three instances when allegations not specifically alleged in the administrative charge are nonetheless reasonably related to the charge of discrimination... [1] The first category of reasonably related claims relates to allegations where the complained-of conduct can reasonably be expected to grow out of the charge of discrimination and therefore fall within the scope of the EEOC investigation. [2] The second type of reasonably related claim is one alleging retaliation by an employer against an employee for filing an EEOC charge. [3] The third type of reasonably related claim is where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Daigle v. West,* 225 F.Supp.2d 236, 242 (N.D.N.Y.2002) (internal quotations and citations omitted); *see also Alfano v. Costello,* 294 F.3d 365, 381 (2d Cir.2002) (citing *Butts v. City of New York Dep't. of Housing Preservation and Development,* 990 F.2d 1397, 1402–03). In all three situations, the claims not raised at the administrative level are considered in federal court because "it would be unfair ... to bar such claims in a civil action." *Butts,* 990 F.2d at 1402. The complained

---

**13.** Though the school district refers to this issue as one of "jurisdiction," *see* Docket No. 27, the Second Circuit has "made clear" that exhaustion of administrative remedies is only a "precondition," and not a jurisdictional prerequisite, to bringing suit in federal court. *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 82 n. 5 (2d Cir.2001) (citing *Francis,* 235 F.3d at 768).

**14.** The "reasonably related" exception to the exhaustion requirement applies as equally to administrative charges filed with DHR as it does to those filed with the EEOC. *See Shah,* 168 F.3d at 614; *Phipps v. New York State Dep't. of Labor,* 53 F.Supp.2d 551, 559 (N.D.N.Y.1999).

of acts in the Amended Complaint not asserted at the administrative level can fall under the first, second, or both of the situations enumerated above.

### 1. *Complained-of conduct reasonably is expected to grow out of the administrative investigation*

Classifying claims as "reasonably related" in this situation "is based on the recognition that most administrative charges are filled out by employees without the benefit of counsel and that the primary purpose of the charge is to alert the agency to the alleged discrimination." *Kent v. General Motors Regional Personnel Center–East Region*, 179 F.Supp.2d 102, 111 (W.D.N.Y. 2001) (citing *Butts*, 990 F.2d at 1402). In this context, "[r]easonably related means that despite the claimant's having failed to specify the precise charge, the EEOC likely would have investigated the conduct complained of anyway. It is of no moment whether the EEOC actually investigated the claim; it is the opportunity to do so that is key." *Findlay*, 82 F.Supp.2d at 33 (internal quotations and citations omitted). Highly relevant to this case, "[s]uccessive conduct that is part of a continuing wrong is by its very nature 'reasonably related' to the earlier conduct," so long as it is alleged in the administrative complaint that the complained of conduct is continuous. *Fitzgerald v. Henderson*, 251 F.3d 345, 360 (2d Cir.2001).

It should be noted, however, that the conduct need not even be "successive." Though it has been stated that only conduct subsequent to the filing of the administrative charge is to be considered, *Daigle, supra*, at 242–243 (citing *Woodcock v. Montefiore Medical Center*, 48 F.Supp.2d 231, 235 n. 4 (E.D.N.Y.1999); *Fitzgerald v. Henderson*, 36 F.Supp.2d 490, 502 (S.D.N.Y.1998)), "a careful reading of *Butts* in its entirety demonstrates that

such literal interpretation... was not intended." *Gardner v. Saint Bonaventure Univ.*, 171 F.Supp.2d 118, 123–24 (W.D.N.Y.2001) (noting also that a claim can "reasonably be expected to grow out of the charge of discrimination" without occurring after the filing of the administrative charge); *see also Cable v. New York State Thruway Authority*, 4 F.Supp.2d 120, 126 (N.D.N.Y.1998) (same, collecting cases).

One natural implication of this exception is that administrative complaints will often be painted with broad strokes, whether that be because the non-cooperative nature of those accused makes discovery of all the essential facts and actions impossible without legal action, or because it is the administrative agency, and not the complainant, that is expected to investigate and discover any evidence of wrongdoing, or perhaps because such complaints are mirrored after ones filed in court, where liberal pleading rules allow plaintiffs latitude prior to discovery. Whatever the reason, it seems clear that this exception allows complainants to make broad allegations—the topic sentences of paragraphs, if you will—and expects the agency, in turn, will investigate those broad allegations and ferret out specific conduct, actions, or evidence, that is reasonably expected to flow from the allegations. With the exception read this way, what is in the administrative complaints is often more telling than what is absent, for it is what is reasonably expected to flow from what is in the complaint that plaintiffs are urging be considered.

In plaintiff's first administrative charge, he alleges the January 14, 1998, conversation with the union attorney, and the advice given to him therein. He alleges, in broad terms, the original and continued denial of access to the 19–A office and files. He alleges, again in broad terms, that he has been falsely accused of sexual

harassment, and that such accusation was the result of his accusing Pristera of the same.

Any events, conversations, or meetings dealing with the denial of access to the 19–A office and files would reasonably be expected to flow from plaintiff's allegation of such denial of access. This includes the conversation between plaintiff's union representative and Pristera, the meeting in which Salerno denied he had given any orders denying plaintiff access, the continued denial of access by Pristera and Roennpagel, plaintiff's conversation with Pristera during which plaintiff intimated that if he were not permitted to do his job, he should resign, the subsequent meeting between plaintiff and Pristera wherein plaintiff informed Pristera he would not resign, and the "acceptance" of plaintiff's "verbal resignation" by Adams.

It is even quite possible that plaintiff's reference to the false sexual harassment complaint filed against him, and any role played therein by Pristera, would be enough to allow consideration of any events, conversations, and meetings purportedly dealing with the conspiracy to convince Kosakowski and others to file such charges against plaintiff. It is not necessary, however, to make even that short leap, as plaintiff's second administrative complaint alleges sufficient detail about such conspiracy so that anything related to it can be considered. This includes the alleged admissions and apology by Kosakowski, and contents of meetings between the alleged conspirators, and among plaintiff, union officials, and school district officials. All would reasonably be expected to flow from investigation of the allegations in plaintiff's second administrative complaint, and are thus properly considered.

Reasonably diligent investigation would also hopefully result in the uncovering of other actions and events involving the alleged conspirators. Anything the alleged conspirators did would foreseeably have the goal of damaging plaintiff's reputation so as to give the school district legitimate cover under which to fire plaintiff. Thus, also reasonably expected to flow from these broad and specific allegations of conspiracy among certain school district officials are events surrounding and pertinent to other actions of the alleged conspirators. This would include the false complaint against plaintiff lodged by Roennpagel, who allegedly acted with Pristera in convincing Kosakowski to file charges against plaintiff, and any conduct of Pristera directly or even indirectly affecting plaintiff, including but not limited to the issuance of disciplinary notices and negative job evaluations. *See Daigle, supra,* at 241–242 (finding claim reasonably related where administrative charge alleged person committed "unrelenting" discrimination and "attempt[ed] to incite others against [Plaintiff]"). The remainder of the acts alleged in the Amended Complaint but not advanced at the administrative level could perhaps fall under this exception as well, but are better addressed under the second exception.[15]

### 2. *Retaliation for filing administrative complaint*

Classifying these claims as "reasonably related" is "based on the close connection of the retaliatory act to both the initial discriminatory act and the filing of the charge itself." *Kent,* 179 F.Supp.2d at 111

**15.** Some of the prior acts discussed fall outside the 300–day limitation period imposed by Title VII. As such, to be properly considered, they must satisfy the continuing violations doctrine. *See McNight v. Dormitory Auth. of State of New York,* 995 F.Supp. 70, 78 (N.D.N.Y.1998). As demonstrated above, the doctrine has potential applicability.

(citing *Butts*, 990 F.2d at 1402). As explained by the Second Circuit in *Butts*, "[d]ue to the very nature of retaliation, the principle [sic] benefits of EEOC involvement, mediation of claims and conciliation, are much less likely to result from [another] investigation. Indeed, requiring a plaintiff to file [another] EEOC charge ... could have the perverse result of promoting employer retaliation in order to impose further costs on plaintiffs and delay the filing of civil actions relating to the underlying acts of discrimination." 990 F.2d at 1402.

Many of the acts alleged in the Amended Complaint, but not in the administrative charges, could be found by a jury to be in retaliation for the filing of administrative charges. After the filing of the first administrative charge, Pristera, only a week later, issued to plaintiff a negative job evaluation. He also issued an allegedly erroneous disciplinary notice, which Adams refused to remove from plaintiff's file. He later issued yet another allegedly unjustified disciplinary notice, and then, after the second administrative charge was filed, he falsely informed a high-ranking school district official that plaintiff had taken one of his trainee's to his home and engaged in sexual relations with her. A jury could reasonably find all these actions were in retaliation for the filing of the administrative charges.[16]

It is also entirely reasonable that the events surrounding the conspiracy to convince other employees, including both Roennpagel and Kosakowski, to file sexual harassment charges against plaintiff were in retaliation for plaintiff's making known his complaints about Pristera. Because the facts as alleged by plaintiff must be taken as true for the purposes of this decision, this is especially true if said charges were false, and the filing of such charges was a pretext for giving the appearance of propriety in plaintiff's termination.

Sagendorf's actions towards plaintiff—the issuance of a disciplinary notice for an alleged parking violation, the refusal to adjust his route time and the refusal, by an employee under her control, to add plaintiff's name to an extra work list—could also reasonably be seen to be retaliation for his filing of administrative charges. Sagendorf worked closely with Pristera, and even participated in the meeting regarding Kosakowski's alleged admissions, which eventually resulted in no action against Pristera. Plaintiff alleges that other drivers were permitted to park in spaces not assigned to them when their assigned spaces were taken by someone else. Plaintiff was not able to do so, and no reason was given for this. Plaintiff alleges that Sagendorf readily adjusted other drivers' route times, but refused to do so in his case for reasons unknown. Similarly, no reason was given at all for the failure to add plaintiff's name to the extra work list. The same could be said Adams' and Salerno's admonishments of plaintiff regarding the parking problem. Both threatened plaintiff with insubordination charges, Adams refused to give plaintiff a letter addressed to him, and plaintiff was allegedly not afforded the proper respect a human being deserves.

---

**16.** Incidentally, it should be noted that the filing of the two charges were arguably not plaintiff's only "protected activities." The voicing of the complaint about Pristera to school district officials would also arguably qualify, as would the filing of the Notice of Claim. Whatever activity is deemed protected, it is clear that the school district knew of plaintiff's lawfully made complaint in 1997. Any activity thereafter would presumably be within the ambit of a retaliation claim, assuming all other requirements were met in a satisfactory fashion.

*See Kent,* 179 F.Supp.2d at 111–12 (finding claim reasonably related where plaintiff alleged in complaint that her "supervisor retaliated against her by treating her in a negative manner, both personally and professionally," because she filed an administrative charge).

Other seemingly minor actions after the second administrative charge fit within this exception. Plaintiff alleges conditions were attached to the use of his leave time that were not present for other employees. Plaintiff alleges school district officials contacted the parents of children who rode the bus he drove, and asked them if they had complaints about plaintiff. While it is admitted that both of these actions, or all the acts alleged by plaintiff for that matter, may indeed have their roots in non-retaliatory bases, it is also reasonable that they were in furtherance of the retaliatory policy applied to plaintiff.

Plaintiff also alleges the filing of civil service charges, which resulted in his suspension and then termination, were the culmination of the retaliatory policy. The Amended Complaint is sufficiently plead to support such a conclusion. While defendants may indeed prevail upon the jury that such termination was justified, it is inappropriate, as a matter of law, to make such a determination at this stage.

Defendants' argument that the retaliatory acts were not sufficiently related in time and substance to the retaliatory policy also fails. The Amended Complaint sufficiently alleges such relation, and such an issue is for the jury to consider. At this stage of the litigation, the numerous allegations of application of the retaliatory policy, spanning a time period of multiple years, is sufficient to overcome dismissal. Therefore, all events, meetings, conversations, and acts alleged by plaintiff in the Amended Complaint are appropriately considered as part of his Title VII claim.

Finally, it must be remembered that plaintiff is alleging a policy of retaliation. He is not alleging that each act by school district officials is independently actionable. Instead, the argument is that each act was a building block, or pinprick, of the retaliatory policy. If courts did not allow such policy claims, necessarily made of such smaller events, to proceed and afford plaintiffs relief if a jury so decides, then employers could feel free to insulate themselves from liability by simply instructing their charges to do anything detrimental to employees short of actual termination or demotion. Working environments could willfully be made hellacious or intolerable for employees, and plaintiffs' only recourse would be to quit. This is clearly not what Congress intended in enacting the anti-retaliation provision of Title VII. The legislation was intended instead to prevent just such behavior.

## IV. CONCLUSION

Plaintiff's Amended Complaint alleges sufficient facts to overcome defendants' motions for dismissal. With respect to his § 1983 claims, the availability of the continuing violations doctrine is not foreclosed as a matter of law, and the Amended Complaint raises factual questions on the substantive merits. With respect to his Title VII claims, the acts not alleged in the administrative complaint but asserted in the Amended Complaint are reasonably related and therefore appropriately considered.

Accordingly, it is

ORDERED that

1. Defendant Guilderland Central School District's motion to dismiss plaintiff's *first* and *second* causes of action is DENIED;

2. Defendant Paul Pristera's motion to dismiss plaintiff's *fifth* cause of action is DENIED.

3. Pursuant to stipulation, the *third* and *sixth* causes of action are DISMISSED; and

4. The defendants shall file and serve Answers to the Amended Complaint on or before January 20, 2003.

IT IS SO ORDERED.